Chief Judge Breitel.
Petitioners, New York City School Boards Association and 22 community school districts, brought a CPLR article 78 proceeding to prohibit respondent New York City Board of Education from implementing a collective bargaining agreement with intervenor United Federation of Teachers. Supreme Court dismissed the petition. The Appellate Division affirmed and petitioners appeal.
The issue is whether the central New York City Board of Education has the power, in a negotiated accommodation with the teachers’ union, to lower the hours of instruction in the New York City public school system, contrary to the wishes of certain community school districts.
There should be an affirmance. Absent State regulation or restriction, the central city board of education has the power to establish, consistent with minimum educational standards, a uniform city-wide policy or standard with respect to the hours of instruction in the public schools. Confronted with the city’s grave fiscal crisis and an unlawful teachers’ strike, the central board acted to reduce expenditures throughout the school system by shortening the hours of instruction by two 45-minute periods per week. Because this action falls within *116 the central board’s powers to establish standards and policies, to bargain collectively with all the city teachers, and to supervise the overall city educational budget, it was not violative of the statutes providing for school district decentralization in the City of New York.
Early in September, 1975, in the midst of the city’s fiscal crisis, collective bargaining between the central board and the teachers’ union collapsed, and the teachers went on strike. The embattled parties, nevertheless, continued to seek compromise and on September 15 an agreement was reached which ended the unlawful strike.
A provision in a side agreement or memorandum to the collective agreement required the teachers to "waive” two 45-minute "preparation periods”, periods during which a teacher is not actually teaching but is expected to be engaging in preparation for course teaching and professional advancement. Two additional 45-minute preparation periods were to be scheduled "during the two periods when pupils have been dismissed in accordance with the shortened instructional day of pupils established by the Board”. It was estimated that the "waiver” of the preparation periods would result in a significant cost saving, approximately $25 million, to the city, because of the reduced need to employ substitute teachers.
As is apparent from the language of the side agreement, the parties had already agreed, in return for the "waiver” of the preparation periods, that the central board would shorten the instructional day, and thus the teachers’ class load, by two 45-minute periods per week. Indeed, further provision was included in the side agreement to protect the quid pro quo: If the board should restore one period for students, then one "waived” preparation period must also be restored; if the board should restore two periods, then two "waived” preparation periods must also be restored.
The ultimate general management and control of educational affairs in the State is vested in the Board of Regents and Commissioner of Education (NY Const, art V, § 4; art XI, § 2; Education Law, §§ 207, 305; see Matter of Ocean Hill-Brownsville Governing Bd. v Board of Educ. of City of N. Y., 23 NY2d 483, 485). Thus, it is within the power of the Board of Regents and the State Commissioner to determine the appropriate hours of instruction in the schools. Unlike the minimum number of days in the school year, which has been *117 fixed by statute, to date no State statute or regulation prescribes a minimum number of instructional hours per week or day (see Education Law, § 1704, subd 2). By regulations, however, effective September 1, 1976, the State Commissioner has fixed the minimum length of the school day for "state aid purposes”.
The conflicting positions taken by the community boards and the city board with respect to the city board’s power to reduce the hours of instruction arise quite naturally from the statutes defining their respective authorities. They do indeed overlap and breed conflict, but the primacy of authority as between the two sides rests in the city board.
Thus, the Education Law sections describing the city board’s and the Chancellors’ power in pertinent part read as follows:
Section 2552
"The board of education of each such city school district is hereby continued. The educational affairs in each such city school district shall be under the general management and control of a board of education”.
Section 2590-g
"The city board except as otherwise provided herein shall have all the powers and duties the interim board of education of the city district had on the effective date of this article, and shall determine all policies of the city district.
"In addition the city board shall have power and duty to: * * *
"5. For all purposes, be the 'government’ or 'public employer’ of all persons appointed or assigned by the city board or the community boards.
"6. Be the government or public employer of all persons appointed or assigned by the city board and the community boards for purposes of article fourteen of the civil service law; provided, however they shall establish formal procedures under which the community boards will be consulted with respect to collective negotiations by the chancellor with employee representatives on matters which affect their interests. Any contract or contracts between the city board and any employee organization in effect on the effective date of this article shall continue to be binding on the city board and the community boards and any contracts entered into by it as the government or public employer thereafter shall be binding on the city board and the community boards.”
*118 Section 2590-i provides generally for the Chancellor and the city board to prepare the city school budget and that:
"7. Upon the final adoption of the appropriation for the city district in each year, the city board through the chancellor shall allocate among the community boards the funds appropriated in the units of appropriation for the programs or activities of such boards on the basis of objective formulae established annually by the city board, after considering the recommendation of the chancellor and after consultation with the community boards and the mayor of the city of New York, such formulae shall reflect the relative educational needs of the community districts to the maximum extent feasible.” Section 2590-h
"[The Chancellor] shall have all the powers and duties as the superintendent of schools of the city district, except as otherwise provided herein. He shall also have the power and duty to: * * *
"8. Promulgate minimum educational standards and curriculum requirements for all schools and programs throughout the city district”.
And comparable provisions of the statute defining the community board’s powers read:
Section 2590-e
"Each community board shall have all the powers and duties, vested by law in, or duly delegated to, the local school board districts and the board of education of the city district on the effective date of this article, not inconsistent with the provisions of this article and the policies established by the city board, with respect to the control and operation of all prekindergarten, nursery, kindergarten, elementary, intermediate and junior high schools and programs in connection therewith in the community district. The foregoing shall not be limited by the enumeration of the following, each community board shall have the power and duty to: * * *
"2. appoint, define the duties, assign, promote and discharge all its employees and fix their compensation and terms and conditions of employment, not inconsistent with the provisions of this article or any applicable collective negotiation agreement.
"3. determine matters relating to the instruction of students * * *
*119 "4. generally manage and operate the schools and other facilities under its jurisdiction.”
Significantly, by the preamble to section 2590-e the powers of the community boards are made subject generally to the policies established by the city board.
With the applicable statutes in mind, the analysis may proceed from the general to the particular.
Subject to State regulation or restriction, boards of education in city school districts (not to be confused with decentralized community school districts) may evidently determine the appropriate length of the school day (see Education Law, § 2554, subd 13). In New York City, of course, power over the schools is shared between the central board and the boards of the community school districts (see Education Law, §§ 2590-e, 2590-g). The city board has the broad power to "determine all policies of the city district” (§ 2590-g). In the same fashion as the State Board of Regents has State-wide powers, the general management and control of the educational affairs of the city district is vested in the city board (§ 2552; Matter of Council of Supervisors & Administrators of Public Schools of N. Y. City v Board of Educ. of City of N. Y. 73 Misc 2d 783, 788, affd 42 AD2d 930, affd 35 NY2d 861). Thus, the city board submits the city-wide school budget, determines the allocation of school funds, and is denominated and acts as the public employer of all persons appointed or assigned by it or by the community boards (Education Law, § 2590-i, subds 7, 16; § 2590-g, subds 5, 6). The Chancellor, as the chief executive officer of the city board, is empowered to "Promulgate minimum educational standards” throughout the city district (§ 2590-h, subd 8). Except as provided in article 52-A of the Education Law, the Chancellor has the "supervision and direction over the enforcement and observance of the courses of study” (§ 2566, subd 7; § 2590-h). Thus, the city board and the Chancellor are responsible for policy having city-wide impact (see Kryger v Board of Educ., 37 AD2d 622, 623).
The powers of a community school board are limited to matters relating to the community school district (see Matter of Roher v Dinkins, 32 NY2d 180, 183-184; Matter of Duncan v Nyquist, 43 AD2d 630, 631-632). While a community board has the general power to determine matters relating to the instruction of students within the district, such power may not be exercised inconsistently with policies established by the city board (Education Law, § 2590-e; see Community School *120 Bd., Dist. No. 22 v Board of Educ. of City of N. Y., 44 AD2d 713, 714).
As the body responsible for uniform city-wide public school policy, the city board acted, rightly or not, within the scope of its powers in determining the appropriate number of the hours of instruction. It is conceded by the community boards that the city board could mandate minimum hours of instruction throughout the city school system. The community boards challenge, however, and this is their strongest argument, as violative of the statutory principle of decentralization, the city board’s action in setting any specific number of hours of instruction other than to prescribe a minimum, here a reduction of two 45-minute periods from the previous schedule or practice.
The city board, under the quoted statutes, has the primary responsibility for city-wide educational policy. Thus, even without more, it would appear to lie within the province of the city board to fix the number of the hours of instruction. But there is more. "Minimum” standards are not, or at least need not be, the same as minimum hours of instruction. Indeed, in some contexts the term minimum may set an upper limit which may not be exceeded, like the eight-hour day in private industry. As noted earlier, the Chancellor has the responsibility for fixing "minimum” standards. Moreover, the number of hours of class teaching is not solely a matter of instruction policy. It is also a function of budgetary considerations and also a term or condition of teacher employment. Both budget and collective teacher agreements are the responsibility of the city board. Thus, apart from pursuing pedagogical goals, the city board would inevitably have the responsibility, consistent with their own and State minimum educational standards, to determine the number of the hours of instruction, because of their effect on budget and collective agreements.
A candid assessment is indicated. The board’s decision, administratively and under their by-laws, to shorten the instructional day by two 45-minute periods per week was made in the context of the city’s desperate financial crisis. Notably, the change in hours of instruction was not directly evidenced in the collective agreement or the side agreement but was a part of the negotiated accommodation with the teachers. Budget cuts imposed upon the board by the city had to be met by sharply curtailed expenditures. Whipsawed between the *121 irresponsibly striking teachers and an intractable fiscal dilemma, the board made what it apparently believed was the best of the situation. Yielding to the teachers, the board reduced the school day by two 45-minute periods per week, and in the side agreement the striking teachers "waived” two of their 45-minute preparation periods, all at an estimated saving, according to one of the briefs, in the range of between $25 and $50 million. While it is possible to question, as does amicus State Commissioner of Education, the educational wisdom of this solution, it is not for the courts to do so. As long as the act was within the power of the city board, which it was, the courts may not interfere. The courts may not under the guise of enforcing a vague educational public policy, suggested to it, assume the exercise of educational policy vested by constitution and statute in school administrative agencies. This is not to say that there may never be gross violations of defined public policy which the courts would be obliged to recognize and correct.
The community school boards also contend that the provision in the negotiated accommodation for a shorter instructional day violates public policy and thus may not have been the subject of collective bargaining under the Taylor Law (Civil Service Law, art 14). On its face, the side agreement provides only for a "waiver” by the teachers of two 45-minute preparation periods and spells out the consequences of restoring hours of instruction already eliminated by the city board. There is no doubt and no persuasive contradiction that the shortening of hours of instruction was an exchange for the "waiver” of the preparation periods. But even if this be true, it does not mean that the accommodation violated public policy.
The city board was free to negotiate with the teachers’ union regarding the hours of instruction. As noted above, the number of hours of instruction is generally a term or condition of teacher employment for purposes of collective negotiation under the Taylor Law (Civil Service Law, art 14). In Matter of Susquehanna Val. Cent. School Dist. (Susquehanna Val. Teachers’ Assn.) (37 NY2d 614), the court held that, in the absence of prohibition in statutory or decisional law, or countervailing public policy, a board of education is free to bargain voluntarily about any term or condition of employment. There is no statute or controlling decisional law which prohibits bargaining over the length of the school day. And, *122 absent a failure to maintain minimum educational standards mandated by a higher authority, there is no applicable public policy suggested which prohibits a board of education from reducing the hours of instruction as part of a collective agreement. True, on September 1, 1976, the regulations of the State Education Commissioner will become effective to mandate minimum hours of instruction but, until that time, the board appears to have been free, within the limits of whatever mandated minimum educational standards now exist, to bargain over the number of hours of instruction. Of course, the applicability and retroactivity of the new State regulations are not now before the court. In the meantime, the courts cannot impute to the city board a lack of courage or lack of concern for the interests of the children to be educated.
In all of this imbroglio, and those which may follow, the primary concern should be the students, and not the teachers, and not the parties to the power or ideological struggle between public entities created by overlapping statutes performing parallel fiduciary responsibilities. This much is what is required and therefore it should not be too much to expect; and this is undoubtedly where the State Board of Regents and the State Commissioner of Education have, should, and undoubtedly will, bear their most important role and responsibility. With this role and this responsibility the courts are not equipped and have not been vested by constitution or statute.
The court is grateful to the State Commissioner of Education for accepting its invitation to submit a brief amicus curiae.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed.