EDWARD DONOHUE, Appellant, v COPIAGUE UNION FREE SCHOOL DISTRICT, Respondent.

Second Department, July 31, 1978

APPEARANCES OF COUNSEL

*Siben & Siben (Bernard M. Rosen* and *Sidney R. Siben* on the brief), for appellant.

*Henry A. Weinstein (Charles D. Maurer* on the brief), for respondent.

### OPINION OF THE COURT

DAMIANI, J. P.

The plaintiff appeals from an order which dismissed his complaint.

██ ██ The issue before us is whether the courts of this State recognize a cause of action to recover for so-called "educational malpractice", or for breach of a statutory duty to educate. We hold that such causes of action are not recognized in this State.

The plaintiff was a student at a high school operated by the defendant school district. Although he received failing grades in several subjects and lacked basic reading and writing skills, he was permitted to graduate. Thereafter, he found it necessary to seek tutoring in order to acquire those basic skills which he had not obtained in high school.

The plaintiff then commenced this action to recover $5,000,-000 in damages for the alleged deficiencies in his knowledge. The first cause of action asserted in the complaint sounds in negligence. It alleges that the defendant owed a duty of care to: "teach the several and varied subjects to the plaintiff; ascertain his learning capacity and ability; and correctly and properly test him for such capacity in order to evaluate his ability to comprehend the subject matters of the various courses and have sufficient understanding and comprehension of subject matters in said courses as to be able to achieve sufficient passing grades in said subject matters, and therefore, qualify for a Certificate of Graduation."

It further alleges that because the plaintiff, after graduation, was unable to read and write simple basic English and did not have an understanding of the other subjects covered in his high school courses, the defendant, its agents, servants and/or employees, breached their duty to him in that they: "gave to the plaintiff passing grades and/or minimal or failing grades in various subjects; failed to evaluate the plaintiff's mental ability and capacity to comprehend the subjects being taught to him at said school; failed to take proper means and

precautions that they reasonably should have taken under the circumstances; failed to interview, discuss, evaluate and/or psychologically test the plaintiff in order to ascertain his ability to comprehend and understand such subject matter; failed to provide adequate school facilities, teachers, administrators, psychologists, and other personnel trained to take the necessary steps in testing and evaluation processes insofar as the plaintiff is concerned in order to ascertain the learning capacity, intelligence and intellectual absorption on the part of the plaintiff; failed to hire proper personnel, experienced in the handling of such matters; failed to teach the plaintiff in such a manner so that he could reasonably understand what was necessary under the circumstances so that he could cope with the various subjects which they tried to make the plaintiff understand; failed to properly supervise the plaintiff; failed to advise his parents of the difficulty and necessity to call in psychiatric help; that the processes practiced were defective and not commensurate with a student attending a high school within the County of Suffolk; failed to adopt the accepted professional standards and methods to evaluate and cope with plaintiff's problems which constituted educational malpractice."

The second cause of action asserted in the complaint alleges that the plaintiff is the third-party beneficiary of a duty imposed upon the defendant by section 1 of article XI of the New York State Constitution, which provides: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." The plaintiff alleges that pursuant to this duty, the defendant undertook to operate a public school, but that it failed to educate him.

The defendant moved to dismiss the complaint, *inter alia,* pursuant to CPLR 3211 (subd [a], par 7) for failure to state a cause of action. Special Term granted the motion to dismiss, relying upon the California case of *Peter W. v San Francisco Unified School Dist.* (60 Cal App 3d 814). We affirm.

■ With respect to the first cause of action alleging negligence or so-called "educational malpractice", it is axiomatic that no recovery may be had unless (1) the defendant owed the plaintiff a cognizable duty of care, (2) the defendant failed to discharge that duty and (3) the plaintiff suffered damage as a proximate result of such failure (41 NY Jur, Negligence, § 7). An action to recover for negligence does not lie unless

there exists a duty on the part of the defendant and a corresponding right in the plaintiff *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 341).

■ The question of whether, in any particular set of circumstances, one party owes a duty of care to another is entirely one of law to be determined by the courts (Prosser, Law of Torts [4th ed], § 37, p 206). Judicial recognition of the existence of a duty of care is dependent upon principles of sound public policy and involves the consideration of numerous relevant factors which include, *inter alia: moral* considerations arising from the view of society towards the relationship of the parties, the degree to which the courts should be involved in the regulation of that relationship and the social utility of the activity out of which the alleged injury arises; *preventative* considerations, which involve the ability of the defendant to adopt practical means of preventing injury, the possibility that reasonable men can agree as to the proper course to be followed to prevent injury, the degree of certainty that the alleged injuries were proximately caused by the defendant and the foreseeability of harm to the plaintiff; *economic* considerations, which include the ability of the defendant to respond in damages; and *administrative* considerations, which concern the ability of the courts to cope with a flood of new litigation, the probability of feigned claims and the difficulties inherent in proving the plaintiff's case (see Prosser, Law of Torts [4th ed], § 4, pp 16-23; *Raymond v Paradise Unified School Dist. of Butte County,* 218 Cal App 2d 1, 8-9; *Rowland v Christian,* 69 Cal 2d 108).

The issue of whether school districts are under a duty to exercise reasonable care in the instruction and supervision of students is one of first impression in the courts of this State. However, the First District Court of Appeal of the State of California has considered this precise issue and, in a comprehensive and well-reasoned opinion, has decisively held that no such duty exists *(Peter W. v San Francisco School Dist.,* 60 Cal App 3d 814, *supra).* The plaintiff in *Peter W.* alleged that as a result of the negligence of the defendant school district he had graduated from high school with an ability to read at only the fifth grade level. While noting that it was a truism that educators are bound to discharge their functions with care, the court in *Peter W.* found no duty of care in the legal sense running from the defendant to the plaintiff. It noted that the wrongful conduct and injuries allegedly involved in educa-

tional malfeasance were neither comprehensible nor assessable within the existing judicial framework, stating (pp 824-825):

"Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might—and commonly does—have his own emphatic views on the subject. The 'injury' claimed here is plaintiff's inability to read and write. Substantial professional authority attests that the achievement of literacy in the schools, or its failure, are influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified.

"We find in this situation no conceivable 'workability of a rule of care' against which defendants' alleged conduct may be measured * * * no reasonable 'degree of certainty that * * * plaintiff suffered injury' within the meaning of the law of negligence * * * (referring to Rest. 2d, Torts, § 281), and no such perceptible 'connection between the defendant's conduct and the injury suffered,' as alleged, which would establish a causal link between them within the same meaning.

"These recognized policy considerations alone negate an actionable 'duty of care' in persons and agencies who administer the academic phases of the public educational process. Others, which are even more important in practical terms, command the same result. Few of our institutions, if any, have aroused the controversies, or incurred the public dissatisfaction, which have attended the operation of the public schools during the last few decades. Rightly or wrongly, but widely, they are charged with outright failure in the achievement of their educational objectives; according to some critics, they bear responsibility for many of the social and moral problems of our society at large. Their public plight in these respects is attested in the daily media, in bitter governing board elections, in wholsesale rejections of school bond proposals, and in survey upon survey. To hold them to an actionable 'duty of care,' in the discharge of their academic functions, would expose them to the tort claims—real or imagined—of disaffected students and parents in countless numbers. They

are already beset by social and financial problems which have gone to major litigation, but for which no permanent solution has yet appeared * * * The ultimate consequences, in terms of public time and money, would burden them—and society— beyond calculation." (See, also, the New York case of *Board of Educ., Levittown Union Free School Dist., Nassau County v Nyquist,* 94 Misc 2d 466.)

■ Upon our own examination and analysis of the relevant factors discussed above, which are involved in determining whether to judicially recognize the existence of a legal duty of care running from educators to students, we, like the court in *Peter W.,* hold that no such duty exists. Other jurisdictions have adopted this reasoning as well (see *Beaman v Des Moines Area Community Coll.,* 5th Jud Dist of Iowa, March 23, 1977, No. CL 15 8532, HOLLIDAY, J.; *Garrett v School Bd. of Broward Co.,* Cir Ct, 17th Jud Cir, Broward County, Fla, Dec. 5, 1977, No. 77-8703). This determination does not mean that educators are not ethically and legally responsible for providing a meaningful public education for the youth of our State. Quite the contrary, all teachers and other officials of our schools bear an important public trust and may be held to answer for the failure to faithfully perform their duties. It does mean, however, that they may not be sued for damages by an individual student for an alleged failure to reach certain educational objectives.

The courts are an inappropriate forum to test the efficacy of educational programs and pedagogical methods. That judicial interference would be the inevitable result of the recognition of a legal duty of care is clear from the fact that in presenting their case, plaintiffs would, of necessity, call upon jurors to decide whether they should have been taught one subject instead of another, or whether one teaching method was more appropriate than another, or whether certain tests should have been administered or test results interpreted in one way rather than another, and so on, *ad infinitum.* It simply is not within the judicial function to evaluate conflicting theories of how best to educate. Even if it were possible to determine with exactitude the pedagogical course to follow with respect to particular individuals, yet another problem would arise. Public education involves an inherent stress between taking action to satisfy the educational needs of the individual student and the needs of the student body as a whole. It is not for the courts to determine how best to utilize scarce educa-

tional resources to achieve these sometimes conflicting objectives. Simply stated, the recognition of a cause of action sounding in negligence to recover for "educational malpractice" would impermissibly require the courts to oversee the administration of the State's public school system.

On a number of occasions, the Court of Appeals has explicitly stated that educational policies are solely the province of the duly constituted educational authorities of this State. Thus, in *Matter of Vetere v Allen* (15 NY2d 259, 267) the Court of Appeals upheld the power of the Commissioner of Education to direct local school boards to take steps to eliminate racial imbalance, noting: "Disagreement with the sociological, psychological and educational assumptions relied on by the Commissioner cannot be evaluated by this court. Such arguments can only be heard in the Legislature which has endowed the Commissioner with an all but absolute power, or by the Board of Regents, who are elected by the Legislature and make public policy in the field of education."

In *James v Board of Educ.* (42 NY2d 357), the issue was whether the courts have the power to enjoin, even temporarily, the administration of examinations to pupils based on contentions that the integrity of the examinations had been fatally compromised. In holding that defendant could not be enjoined from administering the examinations, the Court of Appeals reviewed the considerations governing review of educational policies, stating (pp 367-368):

"The courts had no role, and it is not argued that they should have, in selecting the form of examination to be administered. Statute requires the administration of a comprehensive examination and the examination purchased, if simon-pure, would surely be adequate for the purpose. It is not for the courts to say that considerations of educational policy, of the needfulness to make valid comparisons, of the need to prevent cheating, of the need to keep down costs, should have led the chancellor, and the board, to purchase a different form of examination. * * *

"Nor can this court evaluate the merits of petitioners' disagreement with the educational assumptions relied upon by the chancellor. *(Matter of Vetere v Allen,* 15 NY2d 259, 267, *supra.)* Finally, the court is without power to decide whether the chancellor's answer to the difficulty, the administration of alternative examinations to students only in schools affected by irregularity, is sufficient to overcome any taint. 'While it is

possible to question * * * the educational wisdom of this solution, it is not for the courts to do so. As long as the act was within the power of the city board [and, here, also the chancellor], which it was, the courts may not interfere. The courts may not under the guise of enforcing a vague educational public policy, suggested to it, assume the exercise of educational policy vested by constitution and statute in school administrative agencies. This is not to say that there may never be gross violations of defined public policy which the courts would be obliged to recognize and correct.' *(Matter of New York City School Bds. Assn. v Board of Educ.,* 39 NY2d 111, 121, *supra.)* Under the circumstances presented, judicial intervention, of even a temporary nature, was unwarranted and in excess of authority. * * *

"In this case, petitioners raise 'questions of judgment, discretion, allocation of resources and priorities inappropriate for resolution in the judicial arena'. *(Matter of Abrams v New York City Tr. Auth.,* 39 NY2d 990, 992.)* The responsibility for resolving these questions is vested in a network of officials and boards, on both the local and State level. To permit this injunction to stand, and this proceeding to be continued, 'would in effect attempt displacement, or at least overview by the courts and plaintiffs in litigations, of the lawful acts of appointive and elective officials charged with the management of' the New York City public school system (39 NY2d at p 992). With these officials, the matter rests." (See, also, *Board of Educ. v Areman,* 41 NY2d 527; *Matter of New York City School Bds. Assn. v Board of Educ. of City School Dist. of City of N. Y.,* 39 NY2d 111.)

■ The plaintiff's second cause of action sounds in negligence and alleges the breach of a duty found in the State Constitution (art XI, § 1) and enabling legislation (Education Law, art 65). It is our opinion that these enactments merely require the creation of a system of free common schools. Their purpose is to confer the benefits of a free education upon what would otherwise be an uneducated public. They were not intended to protect against the "injury" of ignorance, for every individual is born lacking knowledge, education and experience. For this reason the failure of educational achievement cannot be characterized as an "injury" within the meaning of tort law *(Peter W. v San Francisco Unified School Dist.,* 60 Cal App 3d 814, 826, *supra).* It is a well-established principle of torts that statutes which are not intended to protect

against injury, but rather are designed to confer a benefit upon the general public, do not give rise to a cause of action by an individual to recover damages for their breach (*Steitz v City of Beacon,* 295 NY 51, 56; *Moch Co. v Rensselaer Water Co.,* 247 NY 160, 166; Restatement, Torts 2d, § 288, subd [c]).

The dissent seeks to sustain the second cause of action asserted in the plaintiff's complaint by concluding that the plaintiff has adequately alleged a substantive violation of former section 4404 of the Education Law. That section required, *inter alia,* that each pupil who continuously failed or who was listed as an "under-achiever" be evaluated to ascertain the physical, mental and social causes of the under-achievement and to further determine if the pupil might benefit from special educational programs. Although the plaintiff was a member of the class of pupils denominated as "under-achievers", the defendant's alleged failure to take the actions required thereby did not give rise to an action sounding in tort. For the reasons stated above, this statute was not intended to protect the plaintiff from injury, rather, it merely reflected a legislative direction that greater educational resources be allocated toward satisfying the learning needs of so-called "under-achievers". The grades on the plaintiff's periodic report cards gave notice both to his parents and himself that he had failed in two or more subjects, thus meeting the definition of an "under-achiever" provided in the regulations of the Commissioner of Education (8 NYCRR 203.1 [2]). Having this knowledge, the plaintiff could properly have demanded the special testing and evaluation directed by the statute. Upon the defendant's failure to do so, the plaintiff's remedy would then have been an appeal to the State Commissioner of Education (see Education Law, § 310, subd 7). As stated by the Court of Appeals in *James v Board of Educ.* (42 NY2d 357, 366, *supra):* "The general legislative and constitutional system for the maintenance of public schools secures review by the board of education and, on the State level, by the Commissioner of Education. The purpose of these provisions 'is to make all matters pertaining to the general school system of the state within the authority and control of the department of education and to remove the same so far as practicable and possible from controversies in the courts.' (*Bullock v Cooley,* 225 NY 566, 576-577; see, also, *People ex rel. Board of Educ. v Finley,* 211 NY 51, 57.) Indeed, at one time, the statute specifically forbade review of the commis-

sioner's decision 'in any place or court whatever'. (Education Law, § 310, amd by L 1976, ch 857, § 1.) Although the determinations of the Commissioner of Education are now specifically subject to review, pursuant to CPLR article 78, in the same fashion as those of other administrative officers or bodies (see Governor's Memorandum of Approval, 2 McKinney's Session Laws of NY [1976], p 2450), the statutory alteration is of limited impact for, even under prior law, the courts possessed the authority to set aside the commissioner's decisions if arbitrary or illegal."

■ Finally, the plaintiff's complaint must be dismissed because of the practical impossibility of demonstrating that a breach of the alleged common-law and statutory duties was the proximate cause of his failure to learn. The failure to learn does not bespeak a failure to teach. It is not alleged that the plaintiff's classmates, who were exposed to the identical classroom instruction, also failed to learn. From this it may reasonably be inferred that the plaintiff's illiteracy resulted from other causes. A school system cannot compel a particular student to study or to be interested in education. Here, the plaintiff is not totally illiterate and his academic record indicates satisfactory achievement in several subjects. In addition to innate intelligence, the extent to which a child learns is influenced by a host of social, emotional, economic and other factors which are not subject to control by a system of public education. In this context, it is virtually impossible to calculate to what extent, if any, the defendant's acts or omissions proximately caused the plaintiff's inability to read at his appropriate grade level.

■■■ Accordingly, we hold that the public policy of this State recognizes no cause of action for educational malpractice. We note that unlike the case of *Peter W.* (60 Cal App 3d 814, *supra),* the complaint here contains no allegation of a cause of action for intentional and fraudulent misrepresentation. We, therefore, do not pass upon the viability of any such cause of action.

SUOZZI, J. (dissenting). In my view, the complaint states a valid cause of action.

The first cause of action sounds in negligence and malpractice and alleges, *inter alia,* that the defendant school district was under a duty to educate the plaintiff and qualify him for a high school graduation certificate and that the defendant failed to properly perform that duty.

As a second cause of action, plaintiff alleges the breach of a constitutional duty under section 1 of article XI of the State Constitution. This provision of the Constitution states: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."

In dismissing the first cause of action, the Special Term and the majority rely on a decision of an appellate court in California which dismissed a very similar cause of action *(Peter W. v San Francisco Unified School Dist.,* 60 Cal App 3d 814). An examination of the decision in *Peter W.* reveals that the cause of action was dismissed because of two distinct policy considerations *(Peter W. v San Francisco Unified School Dist.,* 60 Cal App 3d 814, 824-825, *supra):*

1. "[T]hat the achievement of literacy in the schools, or its failure, are influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified."

2. "To hold [schools] * * * to an actionable 'duty of care,' in the discharge of their academic functions, would expose them to the tort claims—real or imagined—of disaffected students and parents in countless numbers * * * The ultimate consequences, in terms of public time and money, would burden them—and society—beyond calculation."

In dismissing the second cause of action for breach of a constitutional duty, the Special Term relied primarily on two New York Court of Appeals cases *(Steitz v City of Beacon,* 295 NY 51 and *Moch Co. v Rensselaer Water Co.,* 247 NY 160).

In *Moch,* the defendant, a waterworks company, contracted with a city to supply water for various needs, including service at fire hydrants. During the period that the contract was in force, a building caught fire, spread to plaintiff's warehouse and destroyed it. Plaintiff brought suit against the water company for failing to supply adequate water pressure and failing to stop the spread of the fire before it reached plaintiff's warehouse.

In dismissing a cause of action for breach of a statutory duty (as well as for breach of contract and for common-law tort), the court stressed that the statutory duty was merely one to furnish water and that there was nothing in the statutory requirements to "enlarge the zone of liability where

an inhabitant of the city suffers indirect or incidental damage through deficient pressure at the hydrants" *(Moch, supra,* p 169).

In *Steitz (supra,* p 54), plaintiff brought an action against the defendant city to recover for damage to property from fire, based on a city charter which provided that the city " 'may construct and operate a system of waterworks' " and that " 'it shall maintain fire, police, school and poor departments.' " In dismissing the cause of action, the Court of Appeals stated (p 55):

"Quite obviously these provisions were not in terms designed to protect the personal interest of any individual and clearly were designed to secure the benefits of well ordered municipal government enjoyed by all as members of the community. There was indeed a public duty to maintain a fire department, but that was all, and there was no suggestion that for any omission in keeping hydrants, valves or pipes in repair the people of the city could recover fire damages to their property.

"An intention to impose upon the city the crushing burden of such an obligation should not be imputed to the Legislature in the absence of language clearly designed to have that effect."

Finally, Special Term noted that the commencement of this action had received substantial attention in educational circles and the news media and that this factor, coupled with the recent adoption of 8 NYCRR 3.45 by the Board of Regents, effective June 1, 1979, indicated that this case posed a grave policy question which should be passed upon by appellate courts. The regulation adopted by the Board of Regents states: "3.45 Diplomas. No high school diploma shall be conferred which does not represent four years or their equivalent in grades above grade eight, and· no such diploma shall be conferred upon a pupil who has not achieved a passing rating in each of the basic competency tests established by the commissioner."

Initially, it must be emphasized that the policy considerations enunciated in *Peter W.* (60 Cal App 3d 814, *supra)* do not mandate a dismissal of the complaint. Whether the failure of the plaintiff to achieve a basic level of literacy was caused by the negligence of the school system, as the plaintiff alleges, or was the product of forces outside the teaching process, is really a question of proof to be resolved at a trial. The fear of

a flood of litigation, perhaps much of it without merit, and the possible difficulty in framing an appropriate measure of damages, are similarly unpersuasive grounds for dismissing the instant cause of action. Fear of excessive litigation caused by the creation of a new zone of liability was effectively refuted by the abolition of sovereign immunity many years ago, and numerous environmental actions fill our courts where damages are difficult to assess. Under the circumstances, there is no reason to differentiate between educational malpractice on the one hand, and other forms of negligence and malpractice litigation which currently congest our courts.

Over and above these preliminary observations, there are additional reasons which dictate against dismissal of the complaint at this stage and which were not discussed by Special Term or by the majority.

The complaint herein is not drafted solely in terms of educational malpractice, i.e., the failure of the school system to successfully teach plaintiff at a certain level. The complaint also charges the following: (1) That the plaintiff failed various subjects; (2) That the defendant was aware of these failures; and (3) That the defendant failed in its duty to ascertain the reason for these failures and to prescribe appropriate corrective measures, if necessary.

The language of the complaint is illustrative: "[T]he defendant * * * gave * * * failing grades in various subjects; failed to evaluate the plaintiff's mental ability and capacity to comprehend the subjects being taught to him at said school; failed to take proper means and precautions that they reasonably should have taken under the circumstances; failed to * * * psychologically test the plaintiff in order to ascertain his ability to comprehend and understand such subject matter".

That the plaintiff was failing various subjects is readily demonstrable from his high school transcript, which is part of the record and which has numerous course failures (grades below 65, the listed passing grade) designated thereon, including two in English. Nor can the defendant claim that these failing grades did not violate any educational standard. It is true that the regulation of the Board of Regents establishing competency tests and passing grades thereon as a requirement for receipt of a diploma (8 NYCRR 3.45) will not be effective until June 1, 1979. However, it should be emphasized that at present, and during the plaintiff's four years at the defend-

ant's high school, the State Commissioner had a regulation in effect which provided (8 NYCRR 103.2):

"103.2 High school diplomas. In order to secure a State diploma of any type the following requirements must be met:

"(a) The satisfactory completion of an approved four-year course of study in a registered four-year or six-year secondary school, including English, social studies including American history, health, physical education and such other special requirements as are required by statute and (Regents regulations) established by the Commissioner of Education."

Anyone reading the plaintiff's high school transcript would be hard pressed to describe his work as a "satisfactory completion" of a course of study.

Having established that the plaintiff was failing numerous courses, which fact was known to school authorities, the crucial question to be resolved is whether the school had a duty under these circumstances to do more than merely promote this plaintiff in a perfunctory manner from one year to the next.

In this regard, former section 4404 of the Education Law, which was in effect at the time the plaintiff was attending defendant's high school, is crucial. Subdivision 4 of that statute provided, in pertinent part: "The board of education of each school district shall cause suitable examinations to be made to ascertain the physical, mental and social causes of * * * 'under-achievement' of every pupil in a public school, not attending a special class, who has failed continuously in his studies or is listed as an 'under-achiever'. Such examinations shall be made in such manner and at such times as shall be established by the commissioner of education, to determine if such a child is incapable of benefiting through ordinary classroom instruction, and whether such child may be expected to profit from special educational facilities. The commissioner of education shall prescribe such reasonable rules and regulations as he may deem necessary to carry out the provisions of this paragraph."

Section 203.1 of the commissioner's regulations provides:

"Children who fail or under-achieve. * * *

"(2) A pupil who 'has failed continuously in his studies' within the meaning of subdivision 4 of section 4404 of the Education Law is one who has failed in two or more subjects of study for a year."

An examination of the plaintiff's transcript indicates that he came within the definition of a pupil who "failed continuously". Despite this fact, the complaint alleges that the defendant "failed to * * * psychologically test the plaintiff in order to ascertain his ability to comprehend and understand such subject matter", which was in direct contravention of the mandate of subdivision 4 of former section 4404 of the Education Law.

The plaintiff has, therefore, shown the existence of a mandatory statutory duty flowing from the defendant to him personally and has alleged the breach thereof by the defendant. To dismiss the complaint, as the majority proposes, without allowing the plaintiff his day in court, would merely serve to sanction misfeasance in the educational system.

In my view, the negligence alleged in the case at bar is not unlike that of a doctor who, although confronted with a patient with a cancerous condition, fails to pursue medically accepted procedures to (1) diagnose the specific condition and (2) treat the condition, and instead allows the patient to suffer the inevitable consequences of the disease. Such medical malpractice would never be tolerated. At the very least, a complaint alleging same would not be dismissed upon motion. In the case at bar, the plaintiff displayed, through his failing grades, a serious condition with respect to his ability to learn. Although mindful of this learning disability, the school authorities made no attempt, as they were required to do, by appropriate and educationally accepted testing procedures, to diagnose the nature and extent of his learning problem and thereafter to take or recommend remedial measures to deal with this problem. Instead, the plaintiff was just pushed through the educational system without any attempt made to help him. Under these circumstances, the cause of action at bar is no different from the analogous cause of action for medical malpractice and, like the latter, is sufficient to withstand a motion to dismiss.

Finally, it should be noted that even in *Peter W. v San Francisco Unified School Dist.* (60 Cal App 3d 814, *supra),* the California Appellate Court recognized that a cause of action for intentional and fraudulent misrepresentation, if properly pleaded, could withstand a motion to dismiss. Accordingly, even though the majority has chosen to affirm the dismissal of the complaint, that affirmance should be without prejudice to replead a cause of action for intentional misrepresentation.

For the reasons heretofore set forth, I dissent and vote to deny that branch of the defendant's motion which sought to dismiss the complaint for failure to state a cause of action. It should be noted that the defendant also moved to dismiss the complaint based upon the plaintiff's failure to file a timely notice of claim pursuant to section 3813 of the Education Law. Since the Special Term dismissed the complaint for failure to state a cause of action, it did not deal at all with the second branch of the defendant's motion, i.e., the plaintiff's failure to serve a timely notice of claim. Accordingly, I would remand to Special Term for determination of that issue.

RABIN and HAWKINS, JJ., concur with DAMIANI, J. P.; SUOZZI, J., dissents and votes to reverse the order, deny the branch of defendant's motion which sought to dismiss the complaint for failure to state a cause of action and remand the action to Special Term to determine whether plaintiff complied with section 3813 of the Education Law, with an opinion.

Order of the Supreme Court, Suffolk County, dated August 31, 1977, affirmed, without costs or disbursements.