OPINION OF THE COURT
John L. Bell, J.
This claim requires the court to decide whether a ski area operator has a legal duty to secure the name of a skier who *9 collides with another skier so as to protect the litigation interest of the latter. Although the precise issue was decided recently by the Supreme Court of Vermont in O’Connell v Killington, Ltd. (164 Vt 73, 665 A2d 39), and earlier by the Supreme Court of Idaho in Northcutt v Sun Val. Co. (117 Idaho 351, 787 P2d 1159) and the Minnesota Court of Appeals in Phillips v Wild Mtn. Sports (439 NW2d 58 [Minn]), such issue, insofar as any reported case is concerned, is one of first impression in New York, a State, which like Vermont, Idaho and Minnesota, has a substantial number of alpine or downhill skiing facilities.
On January 18, 1993, the day of the subject skiing accident, claimant Norbert V. Woods (hereinafter claimant), accompanied by some of his children, their spouses and about 9 or 10 grandchildren, traveled from Schenectady to the Gore Mountain Ski Center located at North Creek. Although the ski center is owned by the State, it is controlled and maintained by the Olympic Regional Development Authority, commonly known as ORDA (see, Slutzky v Cuomo, 114 AD2d 116, appeal dismissed 68 NY2d 663; Pandolph v State of New York, 155 Misc 2d 612, 615).
Prior to 1994, the Supreme Court, rather than the Court of Claims, had jurisdiction over tort claims against ORDA (Pandolph v State of New York, supra). The Legislature, however, amended Public Authorities Law § 2622 in 1994 to confer exclusive jurisdiction upon the Court of Claims "to hear and determine any claim of any person brought hereafter against the authority to recover damages * * * for personal injury arising out of the operation by the authority of any participating Olympic facility owned by the state or of the Gore mountain ski center” (L 1994, ch 169, § 93 [codified as subd [4] of Public Authorities Law § 2622 and retroactive to Apr. 1, 1994] [emphasis supplied]). Claimants filed a notice of intention to file a claim against the State of New York and ORDA in the office of the clerk of the Court of Claims on April 8, 1993, and a claim against ORDA was filed in the clerk’s office on April 27, 1994. Thus, as conceded by ORDA at the commencement of the trial, the Court of Claims has jurisdiction of the present claim against ORDA since the claim was filed after April 1, 1994.
The Woods entourage arrived at the Gore Mountain Ski Center about 9:00 a.m. and secured their ski lift tickets. Since claimant had reached his 70th birthday, he was given a complimentary lift ticket. Each ticket issued at the ski center *10 on the accident date contained a warning printed beside a traditional motor vehicle stop sign symbol. The warning read: "before affixing ticket or allowing ticket to be affixed to YOUR PERSON, READ AND UNDERSTAND THE NOTICE ON THE PEEL-OFF BACKING AND THE 'WARNING TO SKIERS’ POSTED WHERE THIS ticket was purchased.” On the peel-off backing there appeared a notice that skiers and ski lift passengers are governed by the New York Safety in Skiing Code (art 18 of the General Obligations Law) and that before a skier attached the ticket to his person, the skier’s attention "is directed to a posted 'Warning to Skiers’ ” sign displayed where the tickets were purchased. A further warning on the peel-off backing read: "new york law REQUIRES YOU TO SEEK OUT, READ, REVIEW AND UNDERSTAND THAT 'WARNING TO SKIERS’ BEFORE YOU DECIDE TO PARTICIPATE in the sport of skiing.” Finally, below such warning the skier was advised: "skiing is an inherently dangerous sport which can result in personal injury, including catastrophic INJURY, DEATH OR PROPERTY DAMAGE. IF YOU ARE NOT WILLING TO ASSUME THE RISKS SET FORTH ON THE 'WARNING TO SKIERS’, PLEASE DO NOT SKI AT THIS AREA.”
As part of its proof, defendant introduced a copy of the posted "Warning to Skiers” sign located where tickets were purchased. Following the printed direction in bold letters "be a safe skier, know the law” the sign read:
"Section 101, Legislative Purpose. New York State General Obligations Law Article 18
"The legislature hereby finds that alpine or downhill skiing is both a major recreational sport and a major industry within the State of New York. The legislature further finds: (1) that downhill skiing, like many other sports, contains inherent risks including, but not limited to, the risks or personal injury or death or property damage, which may be caused by variations in terrain or weather conditions; surface or subsurface snow, ice, bare spots or area of thin cover, moguls, ruts, bumps; other persons using the facilities; and rocks, forest growth, debris, branches, trees, roots, stumps or other natural objects or man-made objects that are incidental to the provision or maintenance of a ski facility in New York State; (2) that downhill skiing, without established rules of conduct and care, may result in injuries to persons and property; (3) that it is appropriate, as well as in the public interest, to take such steps as are necessary to help reduce the risk of injury to downhill skiers from undue, unnecessary and unreasonable hazards; *11 and (4) that it is also necessary and appropriate that skiers become apprised of, and understand, the risks inherent in the sport of skiing so that they may make an informed decision of whether or not to participate in skiing notwithstanding the risks. Therefore, the purpose and intent of this article is to establish a code of conduct for downhill skiers and ski area operators to minimize the risk of injury to persons engaged in the sport of downhill skiing and to promote safety in the downhill ski industry.”
Claimant testified that he had begun to ski when he was 15 or 16 years old. He skied sporadically until he reached his early 30’s and thereafter skied consistently until he was injured. After securing his skier’s lift ticket on the day of the accident, he skied the remainder of the morning on various ski trails. Following lunch he returned to skiing. The eventual accident in which he fractured his right leg occurred on a ski trail known as Sunway. He described the snow conditions on the Sunway trail as good and related that he had skied the trail three times earlier in the day. When the accident occurred, claimant’s daughter, Catherine Hoffman, was skiing with claimant on the Sunway trail. The court observed that claimant and Mrs. Hoffman were sincere and credible in their remembrance of the events surrounding the skiing accident.
Claimant related that the accident occurred slightly beyond the junction of the Sunway and Quicksilver trails. He described the Sunway trail as being very wide and testified that shortly before the accident he had stopped close to the edge of the Sun-way trail for the ostensible purpose of observing the scenery. His daughter had stopped above him on the trail. He asserted that as he began to shuffle his skis to continue skiing following his short pause on the trail, he turned his head and the unidentified skier was on top of him. Measured from the time that he began to shuffle his skis, he described the collision as occurring almost simultaneously.
Recalling the effect of the collision, claimant stated he was knocked down, stunned and experienced a great deal of pain in his right leg.[1] Although he could not describe the unidentified skier, he stated that he himself was approximately six feet tall and believed that the other skier was taller. He also believed that their heads may have struck. He testified that he had no conversation with the unidentified skier and could not recall *12 his conversation with the member of the ski patrol who came to his assistance. He remembered that his daughter placed something under his head and that the attending member of the ski patrol immobilized his right leg. He recalled a frightening and painful trip by toboggan to the first-aid station at the bottom of the mountain.
Catherine Hoffman verified that the skiing conditions could best be characterized as good on the day of the accident and described the Sunway trail as an intermediate trail. Ski trails, in the parlance of skiers, are often described in ascending order of difficulty as novice, intermediate and expert. Mrs. Hoffman, who was skiing behind claimant, related that immediately before the accident she had stopped about 50 feet uphill from the point where claimant had paused at the edge of the left side of the Sunway trail. She recalled that she had skied the Sunway trail twice earlier in the day and that the condition of the trail did not contribute to the accident. Testifying to the happening of the accident itself, Mrs. Hoffman stated that as she was facing downhill while observing claimant, he began to "edge out”[2] onto the trail. She then noticed another skier proceeding "down fast” and recited that such skier turned left and hit claimant "straight on.” She skied down to claimant, removed her skis and was told by him that his right knee hurt and that he could not remove his skis. She recalled that the accident occurred about 1:00 p.m.
Mrs. Hoffman observed that the other skier was a young man whom she had not seen previously that day, but she could not approximate his age. She asked the other skier if he was "OK” and he replied that he was not sure. She further advised that the member of the ski patrol who arrived to assist claimant asked the unidentified skier the same question but she could not remember the skier’s response. She noted that the skier did appear to be shaken and looked as if he may have been hurt. She did not ask the skier’s name, nor did she request him to remain at the scene. Mrs. Hoffman recalled that claimant was placed on a toboggan and taken down the mountain. As she headed down the mountain, she noticed that the other skier had disappeared. After giving a statement at the first-aid station at the bottom of the mountain, she drove to the Glens Falls Hospital to meet claimant, who had been transported by ambulance to the hospital.
*13 David Carbone, the member of the ski patrol who was dispatched first to the accident scene, testified that he was located at Saddle Patrol adjacent to the Saddle Lodge when he received a call at 1:27 p.m. and was directed by a dispatcher to proceed to the Sunway trail where an accident allegedly had occurred. Mr. Carbone stated that after strapping on his skis, he skied down the trail in such a manner that he would not miss the injured skier in the event that the location of the accident had been reported incorrectly. Arriving at the accident scene, Mr. Carbone observed that the area was safe to enter and free of any hazard and that claimant was lying on the ground. Some skiers were standing in the general area, and Mr. Carbone’s initial impression was that claimant might have caught an edge of one of his skis in the snow and fallen down.
Mr. Carbone was a paid employee as opposed to a voluntary member of the ski patrol, had taken mandatory courses encompassing CPR, life support and winter emergency care for injured skiers. His testimony revealed beyond peradventure his skill as regards initial emergency care for injured skiers.
When Mr. Carbone approached claimant, he saw that he was conscious and alert and did not appear to be having any difficulty breathing. Mr. Carbone asked claimant if he needed assistance and claimant replied affirmatively. Upon asking claimant what had happened, the witness stated that claimant advised that he was making a turn, another skier was making the opposite turn and they smashed head-on. Claimant pointed to the skier, who was standing nearby and appeared to Mr. Carbone to be about 14 years old. Mr. Carbone asked the other skier if he needed first-aid assistance, and the skier declined. Mr. Carbone recalled that he had no further communication with the other skier and was more concerned with the condition of claimant and the possibility of shock. Mr. Carbone made a secondary or full body survey of claimant to determine the extent of any injury and determined that the injury involved claimant’s right leg. The witness then radioed for a sled and additional equipment that he required.
Following his request for assistance, Mr. Carbone recognized that the skier who had collided with claimant had left the scene. He spoke to Mrs. Hoffman and remained at the accident scene until a rescue team arrived with equipment. He then assisted in transporting claimant by toboggan to the base of the mountain. Subsequently, Mr. Carbone gave a narrative, written report to Mark Anderson, his ski patrol director, concerning his dispatch to the accident scene and what had transpired.
*14 When Mr. Anderson was deposed before trial, he advised of the duties of members of the ski patrol including the duties to provide first-aid emergency care to injured skiers, to insure safe transport of an injured skier off the mountain, to proceed through continuing training so as to be able to handle any emergency situation, and to enforce the New York skiing statute, otherwise known as article 18 of the General Obligations Law. He acknowledged that he had instructed members of the ski patrol to first care for any injured skier and, circumstances permitting, to request any other skier involved in an accident with an injured skier to provide a statement at the first-aid station concerning the accident.
No claim is made based on the emergency first-aid care rendered to claimant. Instead, the action against ORDA is premised solely upon claimants’ having lost their opportunity to pursue an action against the unidentified skier because Mr. Carbone failed to secure the name and address of such skier or to request the skier to remain with him until a report could be completed.
No proof was presented at the trial to demonstrate, as contended by claimants, that the unidentified skier was engaged in reckless conduct in violation of General Obligations Law § 18-105 (4). Nor was any evidence introduced that defendant had been made aware before the accident of any prior reckless conduct on the part of the unidentified skier on the day of the accident. The court does note the duty imposed upon claimant "to yield to other skiers when entering a trail or starting downhill” (General Obligations Law § 18-105 [11]), and the duty of all skiers "not to overtake another skier in such a manner as to cause contact with the skier being overtaken and to yield the right-of-way to the skier being overtaken” (General Obligations Law § 18-105 [9]). However, the court finds it unnecessary to determine the comparative negligence of the two skiers before reaching a decision. As in any cause of action predicated upon negligence, the injured party must demonstrate a cognizable duty of care, the breach of which may be considered the proximate cause of the damages suffered by the injured party (Becker v Schwartz, 46 NY2d 401, 410; Olsen v Chase Manhattan Bank, 9 NY2d 829; Kimbar v Estis, 1 NY2d 399; see, Restatement [Second] of Torts § 281). Without duty, there can be no breach of duty, and without breach of duty there can be no liability (Pulka v Edelman, 40 NY2d 781; Kimbar v Estis, supra; Williams v State of New York, 308 NY 548). Whether a defendant owes a duty of care to *15 another in any particular set of circumstances is entirely one of law to be determined by the court (Gerdowsky v Crain’s N. Y. Bus., 188 AD2d 93; Donohue v Copiague Union Free School Dist., 64 AD2d 29, affd 47 NY2d 440).
In the present matter the court holds that ORDA owed no legal duty to claimants to secure the name and address of the unidentified skier to protect claimants’ litigation interest (see, O’Connell v Killington, Ltd., 164 Vt 73, 665 A2d 39,42-44, supra; Northcutt v Sun Val. Co., 117 Idaho 351, 352-353, 787 P2d 1159, 1160-1161, supra; Phillips v Wild Mtn. Sports, 439 NW2d 58, 59-60 [Minn], supra).
Initially, the court notes that a collision between skiers is a risk inherent in the sport of skiing and that the responsibility for the collision between claimant and the unidentified skier rests upon them and not ORDA. Furthermore, the members of the ski patrol at the Gore Mountain Ski Center who were on duty when the accident occurred were not police or peace officers. Upon arriving at the accident scene and determining that the area was free of any hazards that could cause or contribute to the happening of another accident, Mr. Carbone’s primary duties and concern centered upon the well-being of claimant, not upon securing the name and address of the unidentified skier, however helpful to claimants such information might later prove. As the evidence demonstrated, claimant was over 70 years of age and Mr. Carbone was careful to ascertain that claimant was not proceeding into shock. Mr. Carbone’s concern for the well-being of claimant was shared by his daughter, and she also failed to secure the name and address of the unidentified skier and first noticed that the skier already had left the accident scene when the ski patrol personnel began to transport claimant down the mountain to the first-aid station.
In holding that a ski area operator has no duty to obtain the identity of a negligent skier who collides with and injures another skier, the Supreme Court of Vermont in O’Connell v Killington, Ltd. (supra), a case in which the facts closely parallel those of the present claim, observed: "The main concern of defendant’s ski patrol employees is and should be to give emergency medical assistance, remove the injured skier safely from the mountainside, and obtain necessary medical care. We are reluctant to dilute these critical, emergency duties with a responsibility to pursue and identify another skier” (supra, at —, at 43).
In O’Connell (supra), the court cogently observed that even if a ski area operator had a duty to identify, it would have a *16 limited ability to enforce the duty against an uncooperative skier, and such fact suggested that any recognition of a duty should come from the Legislature, which could provide the ski area operator with the means to discharge the duty.
In Northcutt v Sun Val. Co. (117 Idaho 351, 787 P2d 1159, supra) and Phillips v Wild Mtn. Sports (439 NW2d 58 [Minn], supra) the courts of those two States have also held that a ski area operator has no duty to obtain the identity of a negligent skier who collides with another skier and that thus liability cannot attach to the ski area operator.
It is especially significant that in enacting the Safety in Skiing Code in 1988, our Legislature, although imposing the duty "[t]o report any personal injury to the ski area operator before leaving the ski area” upon a skier involved in a collision with another skier (General Obligations Law § 18-105 [13]), did not impose a like duty upon the ski area operator, which has no police powers under the Code or otherwise to require a recalcitrant skier to furnish his name and address (see generally, Frakt & Rankin, Surveying the Slippery Slope: The Questionable Value of Legislation to Limit Ski Area Liability, 28 Idaho L Rev 227, 253 [1991-1992]). Moreover, the fact that members of the ski patrol at the Gore Mountain Ski Center had been directed by the ski patrol director to secure the names and addresses of skiers involved in collisions did not create a cognizable common-law duty (see, O’Connell v Killington, Ltd., supra, at —, at 43).
A review of the Safety in Skiing Code demonstrates the Legislature’s concern with alpine or downhill skiing and the risks of personal injury or death inherent in the sport and its desire to establish a code of conduct to minimize the risk of injury to persons engaged in the sport. Thus, it imposed specific duties upon both ski area operators and skiers.[3] In the absence of a specific legislative determination that a ski area operator has the duty to obtain the name and address of all skiers involved in a collision, a court should not judicially legislate such a duty under the guise of interpretation of the statute so as to create a new cause of action (McKinney’s Cons Law of NY, Book 1, Statutes .§ 73). Such a judicial arrogation of power is unwarranted.
*17 The Safety in Skiing Code also provides that "[u]nless otherwise specifically provided in this article, the duties of skiers, passengers, and ski area operators shall be governed by common law” (General Obligations Law § 18-107). Such provision does not assist claimants in their quest for the imposition of liability against ORDA since the duty sought to be imposed does not exist under the common law.
At the trial claimants, in response to questions posed by the court, argued the inapplicability of New York cases holding that a municipality cannot be held liable for the failure of a police officer to secure the name of a motorist involved in an accident with an injured party (see, e.g., Falco v City of New York, 34 AD2d 673, affd 29 NY2d 918; McNeil v Town of Hempstead, 60 Misc 2d 797, affd 34 AD2d 958, lv denied 27 NY2d 486). In their argument claimants pointed to a dichotomy in the area of proprietary versus governmental functions and that a governmental function of police protection is subject to immunity absent the existence of a special relationship (see, Cuffy v City of New York, 69 NY2d 255).
While the court recognizes that the special relationship rule is customarily employed in New York in cases involving governmental functions, any finding of a breach of duty sought to be imposed in the present matter would necessarily require a special relationship between claimants and ORDA. Although the Supreme Court of Vermont in O’Connell v Killington, Ltd. (supra) did not distinguish between proprietary and governmental functions as regards tort liability, it did conclude: "Our review of decisions from other jurisdictions indicates that, absent a special relationship or undertaking, there is no duty to protect another’s litigation interest” (supra, at —, at 42 [emphasis supplied]). A different rule should not apply in the present case, especially in the absence of any police power granted by the Legislature to a ski area operator to enforce the duty that claimants seek to have imposed.
ORDA’s trial motion for judgment, upon which the court reserved decision, is now granted, and the acting chief clerk of the Court of Claims is directed to enter judgment accordingly.

. At the beginning of trial, claimants’ counsel moved orally for bifurcation of the issues of liability and damages. Initially, the court reserved decision on the motion and soon after the trial began granted the motion.

. All quoted references are to the court’s trial notes unless otherwise indicated.

. Of the four general categories of State legislation enacted concerning the respective duties of skiers and ski area operators, the New York statute encompasses what has been called an "enumerated risk and duties balancing test” (see, Sanders & Gayner, The Cold Truth: Have Attorneys Really Chilled the Ski Industry?, 2 Fordham Ent Media & Intell Prop L Forum 125, 132 [1992]).