ROSS J. HUNTER ET AL. *v.* BOARD OF
EDUCATION OF MONTGOMERY
COUNTY ET AL.

[No. 713, September Term, 1980.]

*Decided February 9, 1981.*

The cause was argued before GILBERT, C. J., and WILNER,
J., and CHARLES E. ORTH, JR., *Associate Judge of the Court
of Appeals* (retired), specially assigned.

*Browne L. Kooken,* with whom were *Charles A. Dukes, Jr.,* and *Dukes & Kooken* on the brief, for appellants.

*Paul V. McCormick,* with whom were *McInerney, Layne, McCormick, Sullivan & Rice* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

The case before us asks that we hold the Montgomery County Board of Education and certain named teachers [1] liable to the appellant, Ross J. Hunter, for failure to provide him with a quality education.

Young Hunter, acting through his parents, sued the appellees for educational malpractice. The essence of the action is that the Board of Education and the teachers failed to teach him properly, and that they knew or should have known of his inability to comprehend that to which they had exposed him. In short, the teachers have been sued for failure to see that Hunter drank from the well of knowledge. [2]

The record discloses that the appellants, Hunter and his parents, Joseph and Phyllis Hunter, filed a six-count declaration [3] in the Circuit Court for Montgomery County.

---

1. In addition to the Board of Education of Montgomery County, Mabel L. McGirr, William Balant, and James F. Miller were named as defendants. Mrs. McGirr died after litigation was commenced. A suggestion of death was filed on October 30, 1978, and her estate, through the personal representative, was substituted as a party. While the Hunters' claim against Mrs. McGirr's estate was still pending, Balant and Miller demurred to the amended declaration. The circuit court judge entered an order sustaining the demurrer, and an appeal was taken. Because the order had been entered as to less than *all* defendants, the appeal was premature under the provisions of Md. Rule 605 a. We, therefore, dismissed the appeal in an unreported per curiam opinion, Hunter v. Board of Education of Montgomery County, No. 1102, Sept. Term, 1979 (filed April 25, 1980). The defect having been corrected, the appeal was resurrected.

2. Jim Oigan was once heard to remark that "getting an education is sort of like depositing money in a building and loan association; the dividend you receive is exactly the same as your interest." *See* Gilbert, *"Goldilocks a/k/a Goldy Locks v. State,"* Vol. X, U. of Balt. L. Forum 17, 18 (1979). Because this case was decided on demurrer, we do not know the extent of young Hunter's interest.

3. Count I alleged "educational malpractice" in traditional negligence form. Count II realleged the averments of Count I and added that the acts were wilful and deliberate. Count III alleged that the Board was negligent

The complaint sought recovery for "educational malpractice" from the Board of Education of Montgomery County and three of its employees [4] (hereinafter collectively referred to as the Board). The Board demurred to the complaint, and Judge Plummer M. Shearin, after hearing argument, concluded that the maintenance of such a suit would not be permitted in this State. The judge opined that "public policy" barred the action, and he sustained the appellee's demurrer without leave to amend.

The Hunters urge us to reverse the judgment of the circuit court, thus enabling them to pursue their claim for damages against the appellees. The Hunters have raised three issues, but we shall dispose of the matter by dealing with but one, namely, was the hearing judge correct in sustaining the demurrer without leave to amend?

To answer that question, we must travel a route that is unmapped in this State. Neither of the two appellate tribunals has heretofore faced a suit founded in educational malpractice. Consequently, we look for guidance to the courts in other jurisdictions that have had the occasion to discuss the subject.

In *Peter W. v. San Francisco Unified School District,* 60 Cal. App. 3d 814, 131 Cal. Rptr. 854 (1976), the First District Court of Appeal considered a case in which it was alleged, *inter alia,* that the school district negligently deprived the plaintiff of an adequate education. By way of a demurrer the school district challenged the legal sufficiency of the claim, asseverating that the suit failed to allege a cognizable duty of care.

The California appellate court observed that in form the pleading properly alleged negligence. The court, in its

---

in evaluating its personnel and programs. Count IV was identical to Count I but alleged a statutory duty. Count V alleged a breach of an implied contract. The first five counts constituted the suit of the minor Hunter against the appellees. In the sixth and final count Mr. and Mrs. Hunter "incorporate by reference all of . . . the allegations of the prior counts."

4. Mabel L. McGirr was the principal of the appellant's grammar school; William Balant, according to the declaration, "engaged in diagnostic testing" of young Hunter; and James F. Miller was Hunter's sixth grade teacher.

opinion, noted, however, that "judicial recognition of . . . [a] duty [of care] in the defendant, with the consequence of his liability in negligence for its breach, is initially to be dictated or precluded by considerations of public policy." *Id.* at 822, 131 Cal. Rptr. at 859. The court concluded that no workable rule of care could be articulated. The court, in declining to recognize the neoteric tort of educational malpractice, said:

> "On occasions when the [California State] Supreme Court has opened or sanctioned new areas of tort liability, it has noted that the wrongs and injuries involved were both comprehensible and assessable within the existing judicial framework. This is simply not true of wrongful conduct and injuries allegedly involved in educational malfeasance. Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might — and commonly does — have his own emphatic views on the subject. The 'injury' claimed here is plaintiff's inability to read and write. Substantial professional authority attests that the achievement of literacy in the schools, or its failure, are influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified." (Footnote omitted.) (Citations omitted.) *Id.* at 824, 131 Cal. Rptr. at 860-61.

Three years later, in *Smith v. Alameda County Social Services Agency,* 90 Cal. App. 3d 929, 153 Cal. Rptr. 712 (1979), a plaintiff alleged that the school district had negligently placed him in remedial classes for the mentally retarded when, in fact, he was not retarded. The plaintiff

asserted that by so doing the school district breached its duty of providing appropriate educational training. The California court applied the rule as set out by it in *Peter W., supra,* and held that no valid claim for the recovery of damages was stated.

The Court of Appeals of New York was presented, in *Donohue v. Copiaque Union Free School District,* 47 N.Y.2d 440, 413 N.Y.S.2d 375, 391 N.E.2d 1352 (1979), *aff'g* 64 A.D.2d 29, 407 N.Y.S.2d 874 (1978), with a claim almost identical to that in *Smith v. Alameda County Social Services Agency, supra.* Donohue sought redress for the alleged failure of the school district to educate him properly. In concluding that the tort of "educational malpractice" was not cognizable in New York, the court opined:

> "The fact that a complaint alleging 'educational malpractice' might on the pleadings state a cause of action within traditional notions of tort law does not, however, require that it be sustained. The heart of the matter is whether, assuming that such a cause of action may be stated, the courts should, as a matter of public policy, entertain such claims. We believe they should not.
>
> Control and management of educational affairs is vested in the Board of Regents and the Commissioner of Education....
>
> . . .
>
> ... To entertain a cause of action for 'educational malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies — a course we have unalteringly eschewed in the past — but, more importantly, to sit in review of the day-to-day implementation of these policies. Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system lodged by Constitution and statute in school administrative agencies." (Citations omitted.) 47

N.Y.2d at 444-45, 418 N.Y.S.2d at 377-78, 391
N.E.2d at 1354.

The court further said that in New York an administrative forum for grievances was provided by statute.[5]

The following year the court, in *Hoffman v. Board of Education of the City of New York,* 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979), *rev'g* 64 A.D.2d 369, 410 N.Y.S.2d 99 (1978), reversed the New York Supreme Court, Appellate Division, and on the authority of *Donohue, supra,* held that public policy precluded recovery for an alleged failure to evaluate properly the intellectual capacity of a student.

The Hunters, appellants in the instant case, contend that we should not follow the lead of the New York and California courts because, in appellants' words, those decisions are "the product[s] of the entire body of law of the borrowed jurisdiction[s]." To hold that public policy precludes such a suit as that initiated by the Hunters would, they say, place this Court astride a " 'very unruly horse' " that would carry us astray. We do not, however, perceive "public policy" to be a mustang, running wild and unbridled.

We had before us, in *Berg v. Merricks,* 20 Md. App. 666, 318 A.2d 220, *cert. denied,* 272 Md. 737 (1974), a question of a teacher's liability for *physical* injury to a student. Judge Lowe, writing for the Court, declared:

> "As delicate a balance exists in attempting to develop a child's body as in attempting to develop his mind. How to maintain that balance is largely a matter of judgment. To the extent that each child is given personal attention, thirty-nine others may be deprived. Which need is given preference upon a given time is a decision made hundreds of times a

---

5. Md. Educ. Code Ann. spells out in detail the duties and functions of school boards, school superintendents, and teachers. The Code of Bylaws of the Maryland State Board of Education provides a way for parents to challenge decisions of school officials. The Educ. Art. does not, however, provide for an award of monetary damages for alleged malpractice. *See* Md. Educ. Code Ann. § 7-304; § 8-306; § 8-404; § 8-415 and Public School Laws of Md. § 13.04.01.07; § 13.07.05.14; § 13.07.05.15.

day by a teacher. The problems are multiplied as a teacher comes to know his students and their various needs and differences. All of these decisions occur repeatedly every fifty minutes daily with classes of various sizes.

In making sensitive 'judgment calls' a teacher must not be made aware of the precariousness of his position, as was Damocles, beneath some economic falchion suspended by the hair of hindsight." *Id.* at 675-76, 318 A.2d at 227.

Judge Lowe's cogent observation as to the decisions of the California and New York courts, as well as that of the United States District Court (District of Connecticut),[6] portends some of the problems which courts would face were we to embark upon the undelineated path that the appellants would have us travel.

To adopt the position that appellants urge upon us would place all teachers under judicial scrutiny. Courts would sit in judgment not only of educational policies and matters entrusted by the General Assembly to the Department of Education, Md. Educ. Code Ann. § 2-106 (1978), and to the local school boards, Md. Educ. Code Ann. § 4-101 (1978), but also of day-to-day implementation of those policies.

It is conceivable that, if allowed, suits for educational malpractice might arise every time a child failed a grade, subject, or test, with the result that teachers could possibly spend more time in lawyers' offices and courtrooms than in the classroom. That happening could give rise to claims of educational malpractice predicated on the teacher's failure to devote sufficient time to teaching. The opposite side of the matter is that if, to avoid suits arising from a student's failing a grade, subject, or test, the teacher "passed" the child, the teacher would likely find himself or herself

---

6. In Loughran v. Flanders, 470 F. Supp. 110 (1979), the plaintiff, a learning disabled minor, brought an action against members of the school board for alleged negligence in failing to implement an appropriate educational program earlier in his school career. The Federal Court in Connecticut dismissed the action on the basis that the Education for All Handicapped Children Act of 1975, § 602 et seq., 20 U.S.C.A. § 1401 et seq., did not sanction such a claim.

defending a malpractice suit because the child was promoted when promotion was not warranted.

We are aware that a serious social problem exists when, as here, a student is "promoted" through the school system, from grade to grade, and, yet, he or she has not been taught to read. We are equally cognizant of criticisms of the teaching profession.[7] The situation is even more serious when one recalls to mind the words of Thomas Jefferson,[8] that a nation cannot be ignorant and free, in a state of civilization, at one and the same time.[9]

The seriousness of a matter, however, does not mean that a solution may be found, or redress obtained, through the use of the court. Courts cannot solve every societal problem. The courts, on constitutional grounds, can decide that all schools must afford equal protections of the laws, but courts may not decide the curriculum, nor the degree of proficiency needed to advance from grade to grade through the school system. The field of education is simply too fraught with unanswered questions for the courts to constitute themselves as a proper forum for resolution of those questions.

We reject the appellants' invitation to create a new tort of educational malpractice, and we hold that the "public policy" of this State bars an action for "educational malpractice."

Incorporated into the appellants' brief is the statement: "The remaining counts [of the appellants' declaration] alleged conspiracy (Count II); corporate responsibility (Count III); statutory violations (Count IV); and breach of contract (Count V). Allegations in each of these counts, it is submitted, were sufficient to support actions on the respective theories. Md. Rule 301."

That brief comment is the only "argument" advanced by the appellants with respect to the hearing court's not ruling on those particular counts. It is not enough! Merely informing this Court of what the "remaining counts"

---

7. *See Time,* June 16, 1980, *Help! Teacher Can't Teach.*

8. *Id.* at 63.

9. Given today's sophisticated weaponry, education may prove to be our first line of defense.

alleged, without argument or citation of authorities, if any, as to why the hearing court should be affirmed or reversed, as the case may be, is not sufficient. We cannot be expected to act in the role of appellants' counsel, seek out and cite authority for the appellants' position, and then doff the role, reassume our judicial duties and weigh, discuss, analyze those authorities, and render a decision.

Because the "other issues" as to Counts II, III, IV, and V were not briefed or argued in this Court, we do not consider them.

> *Order   sustaining   demurrers
> without leave to amend affirmed.*
> *Costs to be paid by appellants.*