JOHN DOE ET AL. v. BOARD OF EDUCATION
OF MONTGOMERY COUNTY,
MARYLAND ET AL.

[No. 135, September Term, 1981.]

*Decided December 22, 1982.*

68

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ., and was reargued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ., and J. DUDLEY DIGGES, Associate Judge of the Court of Appeals (retired), specially assigned.

Argued by *E. John Domingues,* with whom were *Darrel L. Longest* and *Bernstein & Longest* on the brief, for appellants. Reargued by *E. John Domingues* and *Darrel L. Longest,* with whom were *Bernstein & Longest* on the brief, for appellants.

Argued and reargued by *Paul V. McCormick,* with whom were *Mary E. McCormick* and *McCormick, Sullivan & Talbott* on the brief, for appellee Board of Education of Montgomery County, Md. and by *H. Kenneth Armstrong,* with whom were *William A. Ehrmantraut* and *Donahue, Ehrmantraut & Montedonico, Chartered* on the brief, for appellees Montgomery County and Montgomery County Department of Health.

SMITH, J., delivered the opinion of the Court. ELDRIDGE, COLE and DAVIDSON, JJ., dissent. ELDRIDGE, J., filed a dissenting opinion at page 80 *infra,* in which COLE and DAVIDSON, JJ., concur.

Once again we shall reject an attempt to obtain money damages as a result of alleged negligence or "educational malpractice" in the Montgomery County school system. *Hunter v. Bd. of Educ., Mont. Co.,* 292 Md. 481, 439 A.2d 582 (1982), about which we shall have more to say later, was the first such case. We shall apply *Hunter* and· affirm the judgment of the Court of Special Appeals, which concluded that the trial court correctly decided to enter summary judgment in favor of all defendants.

## i The case

A former student, identified as "John Doe," and his parents sued the Montgomery County Board of Education (the Board), its then superintendent of schools, a former superintendent who had served during a number of the years in controversy, Montgomery County, the Montgomery County Health Department (Health Department), and two psychologists said to be in the employ of the Health Department.[1] Demurrers to the declaration were overruled. A motion for summary judgment then was made on behalf of the defendants. The case reaches us in a somewhat unusual posture because, contrary to the usual case, the court had nothing before it on the issue of summary judgment other than the declaration. In other words, in this proceeding there were no depositions, admissions, or affidavits in the record. The trial court entered summary judgment in favor of all the defendants. An appeal to the Court of Special Appeals followed. It affirmed in an unreported opinion, relying upon its opinion in *Hunter v. Board of Educ., Mont. Co.,* 47 Md. App. 709, 425 A.2d 681 (1981). We granted a writ of certiorari to review the important public question here believed to be present, since there was a suggestion that this case arose in a factually different posture from *Hunter.*

The "flavor" of this case may be better perceived when one notes what was said by the Court of Special Appeals:

"Although the appellants' argument is replete with allegations of actionable negligence it is clear that the gravamen of their suit is that of the coveted tort of 'educational malpractice.' Their declaration contains such allegations as: that the plaintiff 'is entitled to a thorough and efficient public education pursuant to' the Constitution of Maryland; that the board of education is responsible 'to provide or

---

1. The declaration first asserts that Doe's counsel "is of the opinion that it is not necessary at this time to publicly disclose Plaintiff's name as it would result in further psychological injury . . . ."

arrange for appropriate educational services'; that the board of education is obliged to provide appropriate educational assessments for those 'in need of special education programs and services'; that the board of education is required 'to provide free education programs and services necessary to identify, diagnose, examine, and educate all children through the age of 20 who are found to be in need of special education services'; that John Doe 'has suffered a loss of an equal education and equal educational opportunity'; that he 'has been denied a thorough and efficient public school education'; that he 'has been subjected to a loss of his right to reasonable and sufficient educational facilities for seven years'; and that he 'has been deprived of seven years of learning opportunity.'"

In our review of an order granting or denying a motion for summary judgment, all inferences must be resolved against the moving party, the defendants in this instance. *Coffey v. Derby Steel Co.,* 291 Md. 241, 246, 434 A.2d 564 (1981). In the circumstances here we shall assume the truth of all material facts which are well-pleaded and of all inferences which reasonably can be drawn from those well-pleaded facts, as would be true upon review of a demurrer. *Hunter,* 292 Md. at 483, and *Hoffman v. Key Fed. Sav. & Loan,* 286 Md. 28, 33-34, 416 A.2d 1265 (1979).

## ii The declaration

We shall from time to time recite facts which may be gleaned from the declaration. Young Doe was joined in the declaration by "James Doe and Jane Doe, [his] natural parents . . . ." The two psychologists who were made parties defendant were said to be "in the employ of the . . . Health Department, working in cooperation and conjunction with and as an agent of the . . . Board . . . ."

The first count of the declaration is eighteen pages long. All defendants were sued under it. It asserts that under

Maryland Code (1978) § 4-107, Education Article, the Board is required "to maintain throughout its political subdivision a reasonably uniform system of quality public school education and equal educational opportunity for all youth." [2] It then says that under § 4-101 (a) "[e]ducational matters affecting Montgomery County are under the control and direction of the . . . Board . . . ." The declaration states that the Board, with the advice of its superintendent, determines the educational policies of the school system and prescribes rules and regulations for the conduct and management of the public schools. References are made to numerous sections of our educational statutes and to the responsibilities of the Board and the Health Department relative to classifying students in the public schools.

When Doe entered the school system in 1967 he was evaluated by Dr. Stickel, "a psychologist in the employ of the . . . Health Department, working in cooperation and conjunction with, and as agent of the . . . Board . . . ." Doe was found to have a verbal I.Q. of 79, a performance I.Q. of 76, and a full scale I.Q. of 75. The narr. refers to a number of additional tests which might have been, but were not, administered to Doe. Stickel concluded that Doe "suffered cerebral damage during his infant years and was retarded or of borderline intellectual level functioning." Doe was placed in the Montgomery County schools upon the basis of Stickel's evaluation and his recommendation that he be placed in a "brain injured class or if no such [brain injured] class spaces remained, placement within retarded classes . . . ." It is claimed that Stickel recommended that Doe be reevaluated in ten months, which was not done.

---

2. All references in the declaration are to various sections of Art. 77 "of the Annotated Code of Maryland," without making reference to the volume involved. It would appear that the 1975 replacement volume is intended. Those sections are now found, virtually without change, although with a different number, in Code (1978) Education Article. For convenience, we shall refer to the latter. Article 77 was extensively revised by Ch. 405 of the Acts of 1969. Some of the provisions to which reference is made in the declaration did not come into the Code until after the 1969 revision. At the time John Doe was first enrolled in the Montgomery County public school system in September 1967, the applicable statutes would have been found in Code (1957, 1965 Repl. Vol., 1967 Cum. Supp.), Art. 77.

The plaintiffs further allege that the failure on the part of the defendants included that of not identifying "a specific individualized educational program . . . ." Doe charges that the Health Department "failed to provide proper and thorough vision and hearing screening tests" as required by statute and various rules and regulations.

According to the declaration, a private physician notified the Board in October 1968 that he had discovered that Doe was not suffering from a brain injury, "but was, in fact, suffering from a severe case of dyslexia, a learning disability." The allegations of the declaration include a claim that several neurologists and psychologists notified the Board that Doe was improperly placed in the Montgomery County school system and that he "should not have been placed in a special education program and programmed with the mentally retarded. . . ."

It is asserted that the Board and the Health Department failed to reevaluate Doe until January 27, 1975, when he was seen by Dr. H. Bruce Johns, also a defendant, who was "a psychologist in the employ of the . . . Board . . . at Montgomery Blair High School . . . ." Then it is charged that notwithstanding Johns' acknowledgment of Doe's "specific learning disabilities and despite the aforesaid evaluations and recommendations by private psychologists and neurologists, . . . Johns recommended that [Doe] be retained in the special education program for those with MLH [, 'mild learning handicaps,'] at Blair High School."

Johns evaluated Doe again in July 1976 at which time he "recommended a special education program at a military school setting for [Doe]," as well as a complete eye examination. It is claimed that the Board and the Health Department, notwithstanding the requirements of applicable law, "failed to provide a timely, efficient, and complete eye examination" of Doe as Johns had recommended.

The plaintiffs allege that Doe "was being improperly managed by the Montgomery County Public School System" and that "despite obvious indications of specific learning

disabilities," Betty H. Roat, an educational diagnostician employed by the Board, recommended that he be retained in the special education program. The declaration then asserts that as a result of the recommendations of the two psychologists and the diagnostician Doe "was caused to be retained in special educational programs and programmed with the mentally retarded . . . for approximately seven (7) years."

The multitudinous allegations further include that the Board, the Health Department, the two psychologists, and "their agents and employees, consistently and repeatedly, over the course of [Doe's] seven-year enrollment in the Montgomery County Public School System, misled . . . James Doe and Jane Doe, as to . . . John Doe's [ ] true capacity and potential for learning and achieving a level of education consistent with his actual ability and intelligence."

The complaint that Doe "ha[d] suffered a loss of an equal education and equal educational opportunity, ha[d] been denied a thorough and efficient public school education, ha[d] been subjected to a loss of his right to reasonable and sufficient educational facilities for seven years, ha[d] been deprived of seven years of learning opportunity," etc., was said to be "[a]s a direct and proximate result of the aforementioned negligence of the . . . Board . . . including its agents and employees, in failing to properly and timely evaluate and re-evaluate [Doe's] intelligence quotient, in hiring incompetent personnel, in failing to discover and in later ignoring [Doe's] obvious learning disabilities, in neglecting to administer timely and adequate hearing and vision screening tests, in failing to identify and provide proper diagnostic services or educational options for [Doe], and in ignoring repeated, consistent evaluations and recommendations by private psychologists, neurosurgeons, neurologists, and psychiatrists . . . ."

The second count is one on behalf of the parents which incorporates the allegations of the first count. All defendants were sued under it. This count refers to "the negligence and incompetence of the . . . Board," which they say caused them

"to expend vast sums of money for the private education, evaluation, diagnosis, counselling, rehabilitation, and treatment of their minor son," and will cause them to make similar expenditures in the future.

The third count likewise refers to the allegations of the first. Among other things, it charges that Dr. Stickel was "negligent in failing to evaluate, examine, and test . . . Doe . . . ." It said that "Stickel's negligence, lack of diligence, and care required under the circumstances, [was] while acting in his official capacity as an employee of the . . . Health Department, and as agent of the . . . Board . . . ." Similar allegations are made as to Dr. Johns in the fourth count. The narr. claimed that "Johns' negligence, lack of diligence and care required under the circumstances, [was] while acting in his official capacity as school psychologist for Montgomery Blair High School and . . . [the] Board . . . ." These counts appear to be against the two psychologists only.

From our extensive review of the declaration it will be seen that, despite the Does' contentions to the contrary, what we have here is not a claim for malpractice in the treatment of young Doe, but a claim that public employees improperly evaluated him for the school system and that the Board improperly placed him within the school system as a result of such evaluation. Indeed, at oral argument it was conceded that the evaluation by Dr. Stickel was for placement in the school system. The Does state that the contention of the defendant-appellees that the Doe claims make this suit one for "educational malpractice" "fails to address the underlying issue as to whether or not the agents and employees were properly qualified and competent to provide and arrange for such services and to properly examine and evaluate [Doe] and whether or not they did their job without actionable negligence." (Emphasis removed.)

### iii The law

Judge Digges opened the opinion for the Court in *Hunter,* 292 Md. at 483, by saying that the "case primarily present[ed] the troubling but nevertheless important

question, . . . not . . . previously addressed by this Court, of whether an action can be successfully asserted against a school board and various individual employees for improperly evaluating, placing or teaching a student." He went on to say for the Court:

"As best we can gather from the declaration, the parents (petitioners here) complain that the school system negligently evaluated the child's learning abilities and caused him to repeat first grade materials while being physically placed in the second grade. It is alleged that this misplacement, which continued at least through grade school, generally caused the student to feel 'embarrassment,' to develop 'learning deficiencies,' and to experience 'depletion of ego strength.' The petitioners further claim that the individual educators, acting intentionally and maliciously, furnished false information to them concerning the student's learning disability, altered school records to cover up their actions, and demeaned the child.

"It is clear, however, that the gravamen of petitioners' claim in this case sounds in negligence, asserting damages for the alleged failure of the school system to properly educate young Hunter, and we first focus our attention on this aspect of it." *Id.* at 483-84.

The Court concluded in *Hunter* after extensive review of the out-of-state authorities:

"We find ourselves in substantial agreement with the reasoning employed by the courts in *Peter W.* [*v. San Francisco United Sch. Dist.,* 60 Cal. App. 3d 814, 131 Cal. Rptr. 854 (1976),] and *Donohue* [*v. Copiague UFSD,* 47 N.Y.2d 440, 391 N.E.2d 1352, 418 N.Y.S.2d 375 (1979)], for an award of money damages, in our view, represents a singularly inappropriate remedy for asserted errors in the educational process. The misgivings expressed in

these cases concerning the establishment of legal cause and the inherent immeasurability of damages that is involved in such educational negligence actions against the school systems are indeed well founded. Moreover, to allow petitioners' asserted negligence claims to proceed would in effect position the courts of this State as overseers of both the day-to-day operation of our educational process as well as the formulation of its governing policies. This responsibility we are loath to impose on our courts. Such matters have been properly entrusted by the General Assembly to the State Department of Education and the local school boards who are invested with authority over them." *Id.* at 487-88.

The Court pointed out that parents who felt aggrieved by the actions of public educators affecting their children were not without recourse since various cited administrative procedures were available. *Id.* at 488.

A case strikingly similar to the one at bar is *Hoffman v. Board of Educ.,* 49 N.Y.2d 121, 400 N.E.2d 317, 424 N.Y.S.2d 376 (1979), which was reviewed in *Hunter.* (The Does would prefer that we follow the intermediate appellate court's opinion in *Hoffman* which the New York Court of Appeals reversed.) In that case the plaintiff child was examined by a certified clinical psychologist in the school system shortly after the child entered kindergarten. The psychologist determined that the child had an I.Q. of 74 and recommended that he be placed in a class for children with retarded mental development. The psychologist was not certain of his findings, however, for reasons that he set forth. He recommended a reevaluation within a two-year period. The child was placed in the program for the mentally retarded. His academic progress was constantly monitored, which seemed to confirm his lack of progress. His intelligence was not retested as recommended, however. At a later date an intelligence test was administered from which it was determined that the child was not retarded. The New York Court of Appeals said:

"[The] plaintiff commenced this action against the Board of Education of the City of New York, alleging that the board was negligent in its original assessment of his intellectual ability and that the board negligently failed to retest him pursuant to Dr. Gottsegen's earlier recommendation. Plaintiff claimed that these negligent acts and omissions caused him to be misclassified and improperly enrolled in the CRMD program which allegedly resulted in severe injury to plaintiff's intellectual and emotional well-being and reduced his ability to obtain employment." 49 N.Y.2d at 124-25.

The court characterized the plaintiff's recitation of specific acts of negligence as being "in essence, an attack upon the professional judgment of the board of education grounded upon the board's alleged failure to properly interpret and act upon [the psychologist's] recommendations and its alleged failure to properly assess plaintiff's intellectual status thereafter." *Id.* at 125. The court then stated:

"In order to affirm a finding of liability in these circumstances, this court would be required to allow the finder of fact to substitute its judgment for the professional judgment of the board of education as to the type of psychometric devices to be used and the frequency with which such tests are to be given. Such a decision would also allow a court or a jury to second-guess the determinations of each of plaintiff's teachers. To do so would open the door to an examination of the propriety of each of the procedures used in the education of every student in our school system. Clearly, each and every time a student fails to progress academically, it can be argued that he or she would have done better and received a greater benefit if another educational approach or diagnostic tool had been utilized. Similarly, whenever there was a failure to implement a recommendation made by any person in the school system with respect to the evaluation

of a pupil or his or her educational program, it could be said, as here, that liability could be predicated on misfeasance. However, the court system is not the proper forum to test the validity of the educational decision to place a particular student in one of the many educational programs offered by the schools of this State. In our view, any dispute concerning the proper placement of a child in a particular educational program can best be resolved by seeking review of such professional educational judgment through the administrative processes provided by statute." *Id.* at 126-27.

### iv The decision

The Does see this case as different from *Hoffman* since here there are individual defendants who are alleged to have improperly evaluated young Doe. We view that as a difference without a distinction, however. The attempt here is to recover not only from the governmental agencies, but also from certain individuals for what the Does conceive to have been a negligent evaluation and placement of young Doe in the school system.

We point out once again that *Hunter* involved, among other things, a "complain[t] that the school system negligently evaluated the child's learning abilities . . . ." 292 Md. at 483. Also, as we said earlier, Judge Digges opened that opinion for the Court by saying that it "primarily present[ed] the troubling but nevertheless important question . . . of whether an action can be successfully asserted against a school board and various individual employees for improperly evaluating, placing or teaching a student." *Id.* It is the third count of the declaration upon which the dissent focuses and dwells. The similarity between this case and *Hunter* will be noted when we again quote from the third count of the declaration in this case that the charge against Dr. Stickel is that he was "negligent in failing to evaluate, examine, and test . . . Doe . . . ." It will be

seen that it is for error in evaluation for purposes of educational placement, regardless of the manner in which others may see fit to characterize it, for which plaintiffs here seek to recover. No school system can operate successfully without a program for evaluating and placing its pupils. No matter how one examines it, the claim here is concerned with the proper administration of the public school system.

The major difference between this case and *Hunter* is that the latter also involved a claim that certain of the respondents "intentionally and maliciously acted to injure [the plaintiffs'] child." We remanded the case for trial of that issue, saying:

> "In declining to entertain the educational negligence and breach of contract actions, we in no way intend to shield individual educators from liability for their intentional torts. It is our view that where an individual engaged in the educational process is shown to have wilfully and maliciously injured a child entrusted to his educational care, such outrageous conduct greatly outweighs any public policy considerations which would otherwise preclude liability so as to authorize recovery. It may well be true that a claimant will usually face a formidable burden in attempting to produce adequate evidence to establish the intent requirement of the tort, but that factor alone cannot prevent a plaintiff from instituting the action." 292 Md. at 490-91 (footnotes omitted).

Unlike the allegations in *Hunter,* however, we have no suggestion here that any defendant acted wilfully or maliciously.

For the reasons stated in *Hoffman* and pursuant to the holding in *Hunter,* the trial court and the Court of Special

Appeals correctly held in this case that summary judgment should be entered in favor of the various defendants.[3]

> *Judgment affirmed; appellants to pay the costs.*

*Eldridge, J., dissenting:*

The majority characterizes this case as an "attempt to obtain money damages as a result of alleged negligence or 'educational malpractice' in the Montgomery County school system." I reject this characterization. I would reverse the decision of the Court of Special Appeals because the case does not involve educational malpractice. Instead, it involves alleged malpractice by members of a health occupation, a cause of action that has long been cognizable in Maryland courts.[1]

*Hunter v. Bd. of Educ., Mont. Co.,* 292 Md. 481, 439 A.2d 582 (1982), was the first case in which this Court considered the matter of educational malpractice. We characterized as educational malpractice a claim, the gravamen of which sounded "in negligence, asserting damages for the alleged *failure of the school system to properly educate* young Hunter." 292 Md. at 484 (emphasis added). The Court placed primary reliance on two cases which had earlier dealt with the concept of educational malpractice: *Peter W. v. San Francisco Unified School District,* 60 Cal.App.3d 814, 131 Cal.Rptr. 854 (1976) and *Donohue v. Copiague Union Free*

---

**3.** In the view we take of this case it is not necessary for us to address such questions as the extent, if any, to which sovereign immunity or governmental immunity might be applicable to an action such as this or whether the arbitration provisions of the Health Care Malpractice Claims Act (Code (1975, 1980 Repl. Vol.) §§ 3-2A-01 to -09, Courts and Judicial Proceedings Article) would be applicable to the claims against the psychologists.

**1.** The alleged malpractice was by two clinical psychologists. Psychologists are licensed and regulated by the State Board of Examiners of Psychologists, an agency of the Department of Health and Mental Hygiene. *See* Maryland Code (1981), §§ 16-101 through 16-404 of the Health Occupations Article. *See also* Pitts v. State Bd. of Examiners, 222 Md. 224, 226-227, 160 A.2d 200 (1960) (likening psychology to the various branches of medicine).

*School Dist.,* 47 N.Y.2d 440, 391 N.E.2d 1352, 418 N.Y.S.2d 375 (1979).

In *Peter W.,* the plaintiff alleged that due to the defendant school district's negligence he had been inadequately educated. Peter W. graduated from high school without the reading and writing skills of at least an eighth-grader. 131 Cal.Rptr. at 856. The plaintiff in *Donohue* made similar allegations: "[N]otwithstanding [Donohue's] receipt of a certificate of graduation [from high school] he lack[ed] even the rudimentary ability to comprehend written English on a level sufficient to enable him to complete applications for employment." *Donohue, supra,* 418 N.Y.2d at 376. Donohue attributed this deficiency to a breach by the defendant school district of its duty to educate and to the negligence of his educators. As applied by both the *Donohue* and *Peter W.* courts, the concept of educational malpractice signifies a claim in which "a graduate who had enjoyed an otherwise normal education, but despite that had . . . graduated as a functional illiterate, . . . now seeks to recover damages in tort from his school district for an alleged failure of its general duty to educate." Note, *Nonliability for Negligence in the Public Schools — "Educational Malpractice" from Peter W. to Hoffman,* 55 Notre Dame Law. 814, 825 (1980). The majority of the Court in *Hunter* viewed the concept in a similar fashion.

In contrast, the petitioners' declaration in the instant case alleges professional malpractice on the part of two clinical psychologists acting as agents for the Montgomery County Board of Education. Count III of the petitioners' declaration alleges, in part, that:

"Ernest G. Stickel was negligent in failing to evaluate, examine, and test the Plaintiff, John Doe, in accordance with proper accepted psychological practice. The Defendant, Ernest G. Stickel, wholly failed to act as a reasonably prudent and competent psychologist in evaluating the Plaintiff; that a reasonably prudent and competent psychologist would have evaluated and diagnosed the Plaintiff,

John Doe, as having a learning disability; that the Defendant, Ernest G. Stickel, failed to exercise that degree of skill, care, and diligence expected of a reasonably competent practitioner in the profession generally acting in the same or similar circumstances, in order to properly evaluate the Plaintiff, John Doe; the Defendant, Ernest G. Stickel, was negligent in diagnosing the Plaintiff as having sustained cerebral damage and in recommending placement within a brain injured class."[2]

Count III clearly presents the requisite elements for pleading a claim of professional malpractice: (1) that a specific standard of skill and care exists for clinical psychologists; (2) that Dr. Stickel failed to conform to that standard of care; and (3) that the failure was the proximate cause of plaintiff's injury. *See Dunham v. Elder,* 18 Md.App. 360, 363, 306 A.2d 568 (1973). While it is true that petitioners' declaration appears to allege negligence by the Board of Education and others,[3] as well as the two psychologists, in oral argument the petitioners' attorney conceded that a direct negligence claim against the Board *et al.* would not be valid in light of *Hunter.* The petitioners' attorney went on to stress that the reason for joining the Board *et al.* as defendants was to "cover all bases" in seeking damages for the psychologists' negligence under the doctrine of *respondeat superior.*

The policy reasons against recognizing a cause of action for educational malpractice, as set forth in *Hunter* and other cases, do not obtain in the present case.

The first justification for not recognizing an educational malpractice cause of action is the lack of a satisfactory standard of care against which a teacher's conduct may be

---

**2.** Count IV contains similar allegations concerning the actions of Dr. H. Bruce Johns, a psychologist employed by the Board of Education of Montgomery County.

**3.** They included the Montgomery County Health Department, Dr. Charles M. Bernardo, Homer O. Elseroad, and Montgomery County.

measured. *Hunter v. Bd. of Educ., Mont. Co., supra,* 292 Md. at 484; *D. S. W. v. Fairbanks No. Star Bor. Sch. Dist.,* 628 P.2d 554, 555 (Alaska 1981); *Smith v. Alameda Cty. Soc. Serv. Agency,* 90 Cal.App.3d 929, 153 Cal.Rptr. 712, 719 (1979); *Peter W. v. San Francisco Unified School District, supra,* 131 Cal.Rptr. at 861. *But see Donohue v. Copiague Union Free School Dist., supra,* 418 N.Y.S.2d at 377 ("Nor would creation of a standard with which to judge an educator's performance ... pose an insurmountable obstacle"). Young Doe and his parents are not asking a judge or a jury to create a standard of care to apply to the psychologists' conduct. The petitioners seek to refer to an existing standard of care: that degree of care and skill which is expected of a reasonably competent practitioner acting under same or similar circumstances. *See Shilkret v. Annapolis Emergency Hosp.,* 276 Md. 187, 349 A.2d 245 (1975). In fact, at oral argument before us the defendants expressly conceded that if Dr. Stickel and Dr. Johns were private psychologists and not acting as agents of the Board, a cause of action for professional malpractice would be stated by the plaintiffs' allegations.

The second reason for refusing to recognize a claim of educational malpractice is "the inherent uncertainty in determining the cause and nature of any damages." [4] *Hunter v. Bd. of Educ., Mont. Co., supra,* 292 Md. at 484. As the majority of this Court stated in *Hunter (id.* at 485, quoting *Peter W. v. San Francisco Unified School District, supra,* 131 Cal.Rptr. at 861):

---

4. A related "reason" expressed by the California courts is doubt whether the plaintiff actually suffered injury. *See* Smith v. Alameda Cty. Soc. Serv. Agency, 90 Cal.App.3d 929, 153 Cal.Rptr. 712, 719 (1979); Peter W. v. San Francisco Unified School District, 60 Cal.App.3d 814, 131 Cal.Rptr. 854, 861 (1976). The New York Court of Appeals correctly perceived this reason to be transparent, stating: "who can in good faith deny that a student who upon graduation from high school cannot comprehend simple English ... has not [sic] in some fashion been 'injured'." Donohue v. Copiague Union Free School District, 47 N.Y.2d 440, 391 N.E.2d 1352, 418 N.Y.S.2d 375, 377 (1979). It is clear that Doe underwent injury through the psychologists' malpractice. Because Doe was erroneously diagnosed and treated as mentally retarded, he was subjected to "shame, humiliation, and ridicule," and now suffers "severe and permanent emotional pain, ... poor self-esteem, depression, and anxiety."

" 'Substantial professional authority attests that the achievement of literacy in the schools, or its failure, is influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified.' "

Whatever the efficacy of this reason in the context of educational malpractice,[5] it is unpersuasive in the instant case. Here, it is agreed that had Dr. Stickel and Dr. Johns not been employed by the Board of Education, this would be a normal case of professional malpractice by health practitioners. We are not concerned with whether Doe was negligently educated but with whether Dr. Stickel's diagnosis was negligent. Presumably, if Doe had been correctly diagnosed as dyslexic, attempts would have been made to teach him to compensate for his dyslexia, and the outcome of those attempts would be shielded from challenge under the rubric of educational malpractice. Here, however, Doe never had the opportunity to learn to compensate because of a health care professional's negligent diagnosis.

A third justification which is advanced for refusing to recognize an educational malpractice cause of action is the "extreme burden which would be imposed on the already strained resources of the public school system." *Hunter v. Bd. of Educ., Mont. Co., supra,* 292 Md. at 484. Whatever may be the validity of this concern in the context of educational malpractice, it furnishes no reason for immunizing the school system from traditional grounds of tort liability such as involved in the present case. In

---

5. The New York Court of Appeals, in declining to permit a suit for educational malpractice to proceed, questioned the validity of this reason. "As for proximate causation, while this element might indeed be difficult, if not impossible, to prove in view of the many collateral factors involved in the learning process, it perhaps assumes too much to conclude that it could never be established." Donohue v. Copiague Union Free School District, *supra,* 418 N.Y.S.2d at 377.

Maryland Code (1978, 1982 Cum. Supp.), § 4-105 of the Education Article, the Legislature limited the availability of the defense of sovereign immunity as follows:

"(d) *Defense of sovereign immunity.* — (1) a county board of education may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured, above $100,000.

(2) A county board may not raise the defense of sovereign immunity to a claim of $100,000 or less."

Thus, the Maryland Legislature, as a policy matter, has decided that local school systems should be liable for the traditionally recognized torts of their agents acting within the scope of employment, at least to the extent of $100,000.00.

The next justification given for denying relief to those alleging educational malpractice is the fear of a flood of litigation. *Hunter v. Bd. of Educ., Mont. Co., supra,* 292 Md. at 486 (quoting *Peter W. v. San Francisco Unified School District, supra,* 131 Cal.Rptr. at 861). *See also D. S. W. v. Fairbanks No. Star Bor. Sch. Dist., supra,* 628 P.2d at 556. But this "argument from mere expediency cannot commend itself to a Court of justice, resulting in the denial of a logical legal right and remedy." *Green v. Shoemaker,* 111 Md. 69, 81, 73 A. 688 (1909) (discussing the "flood of litigation" argument in context of recovery for nervous injury caused by fright without physical injury.) "It is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation,' and it is a *pitiful confession of incompetence* on the part of any court of justice to deny relief on such grounds." W. Prosser, Handbook of the Law of Torts § 12 at 51 (4th ed. 1971). Moreover, even if this justification is valid in a case such as *Hunter,* it has no application to a case such as this. No one has suggested that recognition of a cause of action for the misdiagnosis of a medical condition

by a health occupation professional employed by a school system will give rise to a flood of litigation.[6]

A fifth reason given for denying a cause of action for educational malpractice is that "an award of money damages . . . represents a singularly inappropriate remedy for asserted errors in the educational process." *Hunter v. Bd. of Educ., Mont. Co., supra,* 292 Md. at 487. This statement is often followed by a listing of the administrative remedies available to the parents of a student allegedly receiving an inadequate education. *See, e.g., Hunter v. Bd. of Educ., Mont. Co., supra,* 292 Md. at 488-489; *D.S.W. v. Fairbanks No. Star Bor. Sch. Dist., supra,* 628 P.2d at 557; *Donohue v. Copiague Union Free School Dist., supra,* 418 N.Y.S.2d at 378. Nevertheless, it is conceded that there is no statutory administrative remedy which can result in an award of damages. Whether or not administrative remedies are useful in the context of educational malpractice, they clearly are not helpful in the context of a misdiagnosis by a health care professional, the cure for which necessitates the expenditure of a large sum of money. Moreover, it is not clear that money damages would be "inappropriate" in the instant case. Taking the petitioners' allegations as true, Doe is now 23 years old and has completed his education. He has progressed to second grade reading and spelling levels and a third grade arithmetic level. He still has not learned to compensate for his dyslexia, and he has severe emotional problems. Doe is in need of psychological treatment and adequate special education, neither of which is being given by the school system and both of which cost money.

The final reason for not recognizing a cause of action for educational malpractice is that recognition "would constitute blatant interference with the responsibility for the administration of the public school system." *Donohue v. Copiague Union Free School Dist., supra,* 418 N.Y.S.2d at

---

**6.** As previously noted, the defendants conceded that if a private psychologist engaged in the same conduct, the psychologist would be liable. Yet there has been no flood of malpractice cases in Maryland against psychologists. In fact, very few reported psychologist malpractice cases can be found in Maryland.

378. The Maryland education statutes vest in the state and local boards of education " 'the last word on any matter concerning educational policy or the administration of the system of public education.' " *Hunter v. Bd. of Educ., Mont. Co., supra,* 292 Md. at 488, quoting *Resetar v. State Bd. of Education,* 284 Md. 537, 556, 399 A.2d 225, 235 (1979). Thus, in regard to day-to-day operations and policy determinations, it is believed that courts should not interfere with state and local school board judgments. Permitting a suit by the plaintiffs because of the misdiagnosis of health care professionals, however, would not interfere with such school board judgments. It is a matter which does not involve education policy. A court would not be asked to "evaluate conflicting theories of how best to educate." *Donohue v. Copiague U. Free Sch. Dist.,* 64 A.D.2d 29, 407 N.Y.S.2d 874, 879 (1978). A court would merely determine whether the psychologists adhered to that standard of care in diagnosing Doe that the average clinical psychologist would have employed under similar circumstances. This standard is readily ascertainable through expert testimony. Plaintiffs would not be permitted to go beyond the question of the psychologists' negligence to challenge the school board's decision in placing Doe in special classes. The majority's decision in *Hunter,* therefore, would in no way be undermined by allowing this case to go to trial.

That recognition of a cause of action for professional malpractice would not undermine *Hunter* is clear from *Hunter* itself. In footnote four of the majority opinion in *Hunter,* the Court expressly limited the decision's application (292 Md. at 487-488 n. 4):

"We do not pass here on the question of whether this case indicates a bar to an action against other professionals, normally subject to suit, merely because they are employed in the educational system. As this is not an issue presented by the allegations here, we leave its resolution to an appropriate case."

Furthermore, the policy reasons underlying *Hunter* have no application in the instant case. I would reverse the judgment of the Court of Special Appeals with directions that the case be remanded for a trial.

Judge Cole has authorized me to state that he concurs in the views here expressed.

Judge Davidson has authorized me to state that, while she still adheres to the view expressed in the dissent in *Hunter,* she agrees that the instant case alleges professional, not educational, malpractice and that the judgment of the Court of Special Appeals should be reversed and the case remanded for trial. To this extent she concurs in the views expressed herein.