Irving **KAZANOFF**, Individually and as Executor of the Estate of Shelley Kazanoff, Plaintiff–Appellant,

v.

**UNITED STATES** of America; Just Management Corporation; Daniel Rodriguez; William Deliu; Preferred 100–10 67th Road Condominium Corporation; 100–10 67th Road Condominium Corporation, Defendants–Appellees.

No. 1437, Docket 91–6021.

United States Court of Appeals, Second Circuit.

Argued May 2, 1991.

Decided Sept. 10, 1991.

Jesse I. Levine, Garden City, N.Y. (Levine, Weinberg, Kaley & Pergament, of counsel), for plaintiff-appellant.

Paul Weinstein, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. E.D.N.Y., Robert L. Begleiter, Robin L. Greenwald, M. Lawrence Noyer, Jr., Asst. U.S. Attys., of counsel), for defendant-appellant U.S.

Stephen A. Weinstein, New York City, for defendants-appellees 100–10 67th Road Condominium Ass'n and Just Management Corp.

Linda Gimble, New York City (Harold M. Foster, of counsel), for defendant-appellee Preferred 100–10 67th Road Condominium Corp.

Before OAKES, Chief Judge, WINTER, Circuit Judge, and CONBOY, District Judge.*

CONBOY, District Judge:

Irving Kazanoff, individually and as executor of the estate of Shelley Kazanoff, his deceased wife, appeals from an order of the District Court for the Eastern District of New York (Sifton, *Judge*), dated December 13, 1990, 753 F.Supp. 1056, granting summary judgment to defendants-appellees the United States of America ("the Government"), Just Management Corporation ("JMC"), 100–10 67th Road Condominium Association ("the Association"),[1] and Preferred 100–10 67th Road Condominium Corporation ("Preferred").[2] For the reasons set forth below, the order of the district court is affirmed.

## BACKGROUND

Plaintiff Irving Kazanoff and his wife, Shelley Kazanoff, rented apartment 2J in the building at 100–10 67th Road, Forest Hills, New York. The building was converted to a condominium in 1984. The Association is the owner of the building. Preferred is the owner of several apartments in the building, including the apartment rented by Irving and Shelley Kazanoff. JMC is the managing agent of the building at 100–10 67th Road, pursuant to a written contract with the Association.

On July 21, 1987, Shelley Kazanoff was brutally and tragically assaulted and murdered in her apartment by William Deliu and Daniel Rodriguez, the son of her longtime acquaintance, Elsie Rodriguez. Rodriguez and Deliu had arrived at the building at approximately 9:30 a.m. and passed through the street door, which has no lock, into the building's vestibule. They rang the intercom to the Kazanoffs' apartment, but received no answer. Rodriguez then tried unsuccessfully to "jimmy" the door open using a plastic credit card. Rodriguez and Deliu stayed in the vestibule for approximately one hour, until they were able to enter through the locked lobby door as Charles Anderson, a United States Postal Service mail carrier, exited the building.

* The Honorable Kenneth Conboy of the District Court for the Southern District of New York, sitting by designation.

1. The 100–10 67th Road Condominium Association was sued incorrectly as the "100–10 67th Road Condominium Corporation".

2. Defendants William Deliu and Daniel Rodriguez did not move for summary judgment. In his December 13, 1990 order, Judge Sifton directed Kazanoff to inform the Court within twenty days of the date of the order whether he intended to proceed against Deliu and Rodriguez. Kazanoff did not respond, and the district court accordingly entered judgment in favor of all defendants on January 15, 1991. Kazanoff has not appealed from the judgment in favor of Deliu and Rodriguez.

Anderson has been a letter carrier for the United States Postal Service since approximately 1950. As part of his Postal Service training Anderson received instruction on motor safety and on the necessity of being courteous to the public. Anderson was not instructed by the Postal Service to screen persons entering buildings, nor was Anderson told to question persons while on his postal route to make sure that their presence in any particular place was lawful.

The building at 100–10 67th Road was part of Anderson's mail delivery route, and had been since approximately 1985. Anderson had a key to eight of the ten apartment buildings on his route, including the building at 100–10 67th Road. When Anderson took over his route in 1985, the key to the building was left on the key chain for the route by the letter carrier formerly servicing the building. The superintendent of the building later changed the building's locks, and gave Anderson a new key. According to the superintendent, when he gave Anderson the new key, he told Anderson to be careful with the key and not to allow unauthorized persons to gain entry into the building. Anderson does not recall this conversation.

On an average day, Anderson would arrive at the building at approximately 10:10 a.m. and leave at 10:25 a.m. Upon entering the building, he would first open the set of unlocked doors which lead into the vestibule. He would then use his key to unlock a second set of locked doors, leading into the lobby, where the mail boxes for the building's tenants are located. It is not necessary to use a key to leave the building. Thus, upon leaving, Anderson would simply open and push his wagon through the inner doors, and then repeat the process to exit onto the street.

On July 21, 1987, Anderson entered the building using his key and delivered the mail as usual. Upon leaving the building, he noticed in the vestibule what he believed to be a boy 15 or 16 years old and a man he believed to be 30 or 35. As Anderson was exiting through the locked doors, these two people, who turned out to be Deliu and

Rodriguez, entered the lobby. Anderson thought that Rodriguez and Deliu may have been tenants of the building, or possibly construction workers.

After entering, Rodriguez and Deliu walked up the stairs to the second floor and rang the bell at the Kazanoffs' apartment. Rodriguez identified himself as Elsie Rodriguez's son (Shelley Kazanoff had known Elsie Rodriguez for at least twenty years) and told Mrs. Kazanoff that he needed to talk to her because his mother had died. Mrs. Kazanoff, dressed in her night gown, opened the door slightly, leaving the door lock chain secured, then locked the door and made two phone calls, one to Mrs. Rodriguez.

Deliu and Rodriguez waited outside the Kazanoffs' apartment in the hallway for at least ten minutes. It is not clear from the record whether they were out of sight of the peephole. Mrs. Kazanoff left the apartment dressed to go outside, perhaps unaware that Deliu and Rodriguez were waiting in the hallway. As she left the apartment and turned to lock the door, she was attacked by Rodriguez, who held her arms while Deliu grabbed the keys and unlocked the door. Rodriguez and Deliu then dragged Mrs. Kazanoff into her apartment, where Rodriguez brutally murdered her while Deliu ransacked and looted the apartment.

At approximately 1:00 p.m., Irving Kazanoff returned to the building, using his key to open the locked doors to enter the lobby. Both the lock on the interior set of doors leading into the lobby and the buzzer intercom system were functioning properly on that day. Kazanoff found his wife in the living room and called for an ambulance. Mrs. Kazanoff was declared dead at the scene by the New York City Medical Examiner.

Kazanoff was appointed executor of his wife's estate by the Surrogate of Queens County on March 21, 1988. Daniel Rodriguez was convicted, after a jury trial, of the murder of Shelley Kazanoff and the burglary of the Kazanoff's apartment and is presently incarcerated. In a separate trial, William Deliu, who had earlier con-

fessed to participating in the murder of Shelley Kazanoff and burglarizing the Kazanoffs' apartment, was acquitted on all counts of the indictment.

The only security devices at the building to prevent access by unauthorized persons were the single set of locked lobby doors and an intercom system. The entrance to the building consists of two metal frame entrance doors with glass panels which lead into a vestibule area. These exterior doors are kept unlocked. Beyond the exterior doors are two metal frame, self-closing, buzzer-activated glass doors which open into the lobby. These locked interior doors can be opened manually with a key or electronically through a lock and buzzer intercom system, located on the wall of the vestibule. Through this system, the interior door can be unlocked by someone in a tenant's apartment using the electronic buzzer system.

The building superintendent testified in a deposition that he had heard of several burglaries in the building, although he was not sure exactly when they occurred. From his testimony, it appears that only one of the burglaries, if any, occurred before July 21, 1987, the day Shelley Kazanoff was murdered. Only one of the incidents was reported directly to the superintendent; he informed JMC of each incident. The superintendent also saw a homeless man in the basement of the building on several occasions in the weeks immediately preceding Mrs. Kazanoff's murder. Anderson did not know of any criminal activity of any kind in the building prior to the murder of Mrs. Kazanoff. Moreover, except for this case, Mr. Kazanoff did not know of any assaults in the building during the twenty-six years he had lived there. In fact, there is no specific, first hand, or documentary evidence in the record of a single crime, except that in the present case, ever occurring at the building.

Kazanoff charged the Government with negligently causing the death of his wife because Anderson, a Postal Service employee, permitted Rodriguez and Deliu to enter the building as he was leaving. Kazanoff also charged that defendants JMC, Preferred, and the Association were negligent in failing to provide necessary security for the tenants of the building. Judge Sifton granted these defendants' motions for summary judgment, concluding that (1) no duty of care existed on the part of the Government to keep strangers from entering a lobby when its employee was leaving the building, and (2) that Kazanoff had failed to adduce facts from which a rational trier of fact could conclude that JMC, Preferred, or the Association acted unreasonably or failed to satisfy any duty owned to Kazanoff or his decedent. Kazanoff appeals.

## DISCUSSION

" 'Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Maysonet v. KFC, Nat'l Management Co.*, 906 F.2d 929, 930 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). Under the law of the State of New York,[3] to establish a cause of action in negligence, a plaintiff must show (1) the existence of a duty on defendant's part as to the plaintiff; (2) a breach of that duty; and (3) injury suffered by the plaintiff as a result of that breach. *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333, 424 N.E.2d 531, 535, 441 N.Y.S.2d 644, 648 (1981). We affirm because, as the district court held, the Government did not owe a duty to Mrs. Kazanoff, and the Association, Preferred, and JMC did not breach their duty to Mrs. Kazanoff.[4]

---

**3.** New York law applies to the claim against the Government, which is brought pursuant to the Federal Tort Claims Act, *see* 28 U.S.C. §§ 1346(b), 2674 (1988), and to the common law claims against JMC, Association and Pre-

ferred, which are based on diversity jurisdiction.

**4.** Kazanoff argues that the district court's entry of summary judgment was particularly inappropriate in light of *Noseworthy v. City of New York*, 298 N.Y. 76, 80 N.E.2d 744 (1948), under

## A. *The Government*

■ The Government argues that its employee, Charles Anderson, the postal carrier, had no duty to prevent Rodriguez and Deliu from entering the building at 100-10 67th Road. "An action to recover for negligence does not lie unless there exists a duty on the part of the defendant and a corresponding right in the plaintiff." *Donohue v. Copiague Union Free School Dist.*, 64 A.D.2d 29, 32–33, 407 N.Y.S.2d 874, 877 (2d Dep't 1978) (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928)). "Duty is essentially a legal term by which we express our conclusion that there can be liability.... It tells us whether the risk to which one person exposes another is within the protection of the law." *De Angelis v. Lutheran Medical Ctr.*, 58 N.Y.2d 1053, 1055, 449 N.E.2d 406, 407, 462 N.Y.S.2d 626, 627 (1983). "The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts." *Purdy v. Public Adm'r*, 72 N.Y.2d 1, 8, 526 N.E.2d 4, 7, 530 N.Y.S.2d 513, 516 (1988) (citations omitted).

"A defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." *D'Amico v. Christie*, 71 N.Y.2d 76, 88, 518 N.E.2d 896, 901, 524 N.Y.S.2d 1, 6 (1987). New York courts have, however,

> imposed a duty to control the conduct of others where there is a special relationship: a relationship between defendant and a third person whose actions expose plaintiff to harm such as would require the defendant to attempt to control the third person's conduct; or a relationship between the defendant and plaintiff requiring defendant to protect the plaintiff from the conduct of others.... Under the appropriate circumstances, the traditional master-servant relationship, the relationship between a parent and child, or the relationship between a common carrier and its passenger are examples of such relationships....

*Purdy*, 72 N.Y.2d at 8, 526 N.E.2d at 7, 530 N.Y.S.2d at 516; *see also Pulka v. Edelman*, 40 N.Y.2d 781, 783, 358 N.E.2d 1019, 1021, 390 N.Y.S.2d 393, 395 (1976).

which a wrongful death plaintiff in New York "is not held to the high degree of proof required in a case where the injured person may take the stand and give his version of the happening of the accident." *Id.* at 80, 80 N.E.2d at 745. We note at the outset that, although this court has recognized the *Noseworthy* rule in negligence actions governed by New York law, *see Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984); *Jones v. United States*, 399 F.2d 936, 940 (2d Cir.1968), it is not clear whether a state rule on the sufficiency of the evidence such as the *Noseworthy* doctrine governs in a federal action. *See Mehra v. Bentz*, 529 F.2d 1137, 1139 n. 2a (2d Cir.1975) (assuming, without deciding the issue, that New York law governs the question of sufficiency of evidence); *Eldred v. Town of Barton*, 505 F.2d 186, 187 n. 2 (2d Cir.1974) (whether a federal rule rather than the state rule on sufficiency of evidence governs is "debatable and apparently undecided in this Circuit") (citing *Park v. Village of Waverly*, 457 F.2d 1139, 1140 n. 1 (2d Cir.1972); *Simblest v. Maynard*, 427 F.2d 1, 4–7 (2d Cir.1970); *Evans v. S.J. Groves & Sons Co.*, 315 F.2d 335, 342 n. 2 (2d Cir.1963)).

In any event, *Noseworthy* is inapplicable to this case. The purpose of the *Noseworthy* rule "is to circumvent the situation where a tort-feasor who inflicts personal injury [would] be insulated from liability simply because the injuries produced are fatal ... and the decedent, who would have been in the best position to describe the event from plaintiff's point of view, [is] unavailable to do so." *Holiday v. Huntington Hosp.*, 164 A.D.2d 424, 427, 563 N.Y.S.2d 444, 446 (2d Dep't 1990) (citations and internal quotations omitted). Here, several eyewitnesses to the tragic events leading up to Shelley Kazanoff's death, including Deliu, Rodriguez, and Anderson, have been deposed and are available to testify. More important, the issues here—relating to the actions of the postman and the security system in the building—are not ones as to which Mrs. Kazanoff was a witness. Thus, the rationale for the *Noseworthy* rule is absent.

Nor would application of *Noseworthy* "actually effect a diminution of the standard or quantum of proof as such." *Holiday*, 563 N.Y.S.2d at 446. Rather, "[t]he standard of proof of continues to be proof by a preponderance of the credible evidence. The doctrine's sphere of operation is in the weight to be assigned to circumstantial evidence concerning disputed facts because the more direct and proper source of this evidence no longer exists." *Id.* Thus, contrary to Kazanoff's assertions, application of *Noseworthy* would not diminish his burden of proof.

The relationship between Anderson, the mail carrier, and Mrs. Kazanoff, a tenant in the building, bears no resemblance to the special relationships traditionally recognized by New York courts. Nevertheless, Kazanoff urges this Court to recognize the existence of a duty of care on the part of Anderson, who had been given a key to the building, to afford Mrs. Kazanoff protection from the unauthorized entry of strangers into the building.

In attempting to define the limits which circumscribe a legal duty, "not only logic and science, but policy play an important role." *De Angelis*, 58 N.Y.2d at 1055, 449 N.E.2d at 407, 462 N.Y.S.2d at 627. Thus,

> [j]udicial recognition of the existence of a duty of care is dependent upon principles of sound public policy and involves the consideration of numerous relevant factors which include, *inter alia: moral* considerations arising from the view of society towards the relationship of the parties …; *preventative* considerations, which involve the ability of the defendant to adopt practical means of preventing injury, … the degree of certainty that the alleged injuries were proximately caused by the defendant and the foreseeability of harm to the plaintiff; *economic* considerations, which include the ability of the defendant to respond in damages; and *administrative* considerations, which concern the ability of the courts to cope with a flood of new litigation.

*Donohue v. Copiague Union Free School District*, 64 A.D.2d at 33, 407 N.Y.S.2d at 877 (citation omitted). "While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that 'the legal consequences of wrongs [are limited] to a controllable degree.'" *Waters v. New York City Housing Auth.*, 69 N.Y.2d 225, 229, 505 N.E.2d 922, 923–24, 513 N.Y.S.2d 356, 358 (1987) (quoting *Tobin v. Grossman*, 24 N.Y.2d 609, 619, 249 N.E.2d 419, 425, 301 N.Y.S.2d 554, 561 (1969)). "A line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit." *De Angelis*, 58 N.Y.2d at 1055, 449 N.E.2d at 407, 462 N.Y.S.2d at 627.

The district court correctly concluded that these considerations counsel against recognition of a duty of care on the part of the Postal Service to prevent unauthorized entries. First, "moral considerations" argue against the recognition of a special relationship here. The postal carrier is in no different position from any other person whose regular coming and going may justify giving him or her a key to avoid the necessity of having a tenant open the door each time they appear. Indeed, creating a duty on the part of the postal carrier to prevent entry into the building would expose every tenant and every other service person who accepts a key to liability for allowing unauthorized entries into the building, resulting in a "crushing exposure to liability." *Strauss v. Belle Realty Co.*, 65 N.Y.2d 399, 403, 482 N.E.2d 34, 36, 492 N.Y.S.2d 555, 557 (1985). The broad ramifications that would emanate from the implementation of a new duty in this case is an important factor "appropriately take[n] into account in fixing the orbit of duty that will necessarily control other cases as well as this one." *D'Amico v. Christie*, 71 N.Y.2d at 89, 518 N.E.2d at 902, 524 N.Y.S.2d at 7.

Second, the difficulty of defining the scope of a duty to prevent unauthorized entry also weighs against recognition of such a duty. People do not generally shut doors in others' faces, and, in some instances, such behavior puts the person required to shut the door in another's face at risk of injury. To what lengths must a postal carrier go to prevent unauthorized entry? If a polite "I am sorry, you cannot enter here" does not deter intruders, must the postal carrier use physical force to prevent unauthorized entry? Is he or she required to put himself or herself in physical danger to safeguard the premises? Would the carrier be required to screen out all entrants, or only persons who obviously look threatening?

As to "preventative considerations", the violent crime which took place here was,

from the postman's perspective at least, an unforeseeable, intervening act which broke the chain of causation between the postman's actions and Mrs. Kazanoff's injury. Moreover, it is by no means certain that having postal carriers block entry into buildings would, as Kazanoff suggests, deter would-be assailants or robbers from entering buildings. Training letter carriers to screen entrants to buildings—a daunting administrative task—addresses only one of the many ways in which law breakers enter buildings to do injury. When the orbit of the potential liability is recognized and considered together with the reality that little or no public safety increase can be expected from such a rule, there is no policy basis upon which to ground a change in the common law.

We conclude that no duty exists on the part of the Postal Service to keep strangers from entering a building while a postal carrier leaves it.

B. *Owners and Manager of the Building*

■ Kazanoff charges JMC, the Association, and Preferred, the manager and owners of the building, with negligently failing to provide adequate security for the tenants in the building. We agree with Judge Sifton that Kazanoff failed as a matter of law to establish negligence on the part of these defendants, as no rational trier of fact could conclude that any of these defendants acted unreasonably or failed to satisfy any duty owed to the plaintiff's decedent.

■ The common-law duty of a landlord is to maintain his property "in a reasonably safe condition in view of all of the circumstances, including the likelihood of injury to others, the seriousness of the injury and the burden of avoiding the risk." *Basso v. Miller,* 40 N.Y.2d 233, 241, 352 N.E.2d 868, 872, 386 N.Y.S.2d 564, 568 (1976) (citing *Smith v. Arbaugh's Restaurant,* 469 F.2d 97 (D.C.Cir.1972)), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2774, 37 L.Ed.2d 399 (1973). "The law does not require the defendants to provide the optimal or most advanced security system available, but only reasonable security measures.... To hold other-

wise would cast the defendants in the role of insurers of the safety of the premises." *Tarter v. Schildkraut,* 151 A.D.2d 414, 415, 542 N.Y.S.2d 626, 627 (1st Dep't 1989) (citation omitted).

Defendants argue that they fulfilled their duty of care by complying with N.Y. Multiple Dwelling Law § 50–a (McKinney 1974), which requires a landlord or owner to provide a locked door and an intercom system to prevent unauthorized public access to a multiple dwelling. It is not disputed that defendants complied with these requirements, and that the locks on the doors leading into the lobby and the intercom system were working on the day Mrs. Kazanoff was murdered. Indeed, the locked door prevented Rodriguez and Deliu from gaining access to the building, even when Rodriguez tried to "jimmy" the door open with a credit card. These defendants were only able to gain access to the building when the postal carrier opened the door to leave the building.

Nevertheless, Kazanoff contends that mere compliance with the statutory minimum in Section 50–a was not adequate in light of alleged recent criminal activity in the building—criminal activity which assertedly made the unauthorized entry by Rodriguez and Deliu and the murder of Shelley Kazanoff foreseeable to defendants Preferred, the Association, and JMC. "Under New York law a [landlord] is not liable for the intervening criminal acts of another unless such acts were reasonably foreseeable." *Maysonet v. KFC, Nat'l Management Co.,* 906 F.2d 929, 930–31 (2d Cir. 1990) (citing *Danielenko v. Kinney Rent A Car, Inc.,* 57 N.Y.2d 198, 204, 441 N.E.2d 1073, 1075, 455 N.Y.S.2d 555, 557 (1982); *Nallan v. Helmsley–Spear, Inc.,* 50 N.Y.2d 507, 519, 407 N.E.2d 451, 457, 429 N.Y.S.2d 606, 613 (1980)). "No duty of care arises 'unless it is shown that [defendant] either knows or has reason to know from past experience "that there is a likelihood of conduct on the part of third persons ... which is likely to endanger the safety"'" of those on the property. *Maysonet,* 906 F.2d at 931 (quoting *Nallan,* 50 N.Y.2d at 519, 407 N.E.2d at 457, 429 N.Y.S.2d at 613

(quoting Restatement (Second) of Torts § 344 comment f)). Thus, "a history of criminal activities in a building can give rise to a duty on the part of the building's owner to take reasonable steps to minimize the danger to persons visiting it." *Maysonet*, 906 F.2d at 931 (citing *Nallan*, 50 N.Y.2d at 519, 407 N.E.2d at 458, 429 N.Y.S.2d at 613).

For example, in *Nallan*, the plaintiff was shot by an unknown assailant as he was signing a guest register in the unattended lobby of the building. Apparently the attendant had not locked the doors of defendants' Manhattan office building when he left the lobby to attend to cleaning chores. There were 107 reported crimes in the building in the 21–month period immediately preceding the shooting, including at least 10 crimes against persons. *Id.* at 519–20, 407 N.E.2d at 458, 429 N.Y.S.2d at 613–14. The court held that the plaintiff had stated a prima facie case in negligence. *Id.* Similarly, in *Miller v. New York*, 62 N.Y.2d 506, 467 N.E.2d 493, 478 N.Y.S.2d 829 (1984), liability was imposed upon the State in its proprietary capacity as a landlord for failing to maintain locked doors in a state-operated college dormitory in which a resident student had been raped. There had been previous reports of nonresidents loitering in the dormitory, as well as reports from other campus dormitories of an armed robbery, burglaries, trespass and another rape.

"In sharp contrast [to these examples], the record in the case at bar contains little evidence of criminal activity prior to the date of the [assault]." *Iannelli v. Powers*, 114 A.D.2d 157, 162, 498 N.Y.S.2d 377, 381 (2d Dep't 1986). Citing the testimony of the superintendent, Kazanoff asserts that there were three burglaries in the building before the time of the murder. As we have indicated, however, the superintendent was not certain when the burglaries occurred. In fact, it appears from his testimony that only one of the burglaries, if any, occurred before July 1987, when Mrs. Kazanoff was killed. Moreover, Fed.R.Civ.P. 56(e) requires affidavits based on personal knowledge. Here, the superintendent had no firsthand knowledge of any of the incidents. Thus, Judge Sifton correctly concluded that Kazanoff had not made an adequate showing of prior criminal activity in the building that would have made the attack on Mrs. Kazanoff foreseeable to Preferred, the Association, and JMC and alerted them to a duty to adopt greater security measures.

"The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relations; it is risk to another or to others within the range of apprehension" that delimits the duty's scope. *Palsgraf*, 248 N.Y. at 344, 162 N.E. at 100. Because Kazanoff did not establish that defendants had specific warning that an incident such as the assault on Mrs. Kazanoff would occur, the murder of Mrs. Kazanoff was not a reasonably foreseeable act. Thus, the "intervening criminal act" of Rodriguez and Deliu constitutes a superseding cause of the injury to Mrs. Kazanoff. *See Maysonet*, 906 F.2d at 930.

We recognize that what constitutes reasonable care under the circumstances is ordinarily a question for the jury.

> This is not to say, however, that in every case involving a landowner's liability in negligence the question whether reasonable care was exercised must be determined by the jury.... Only in those cases where there arises a real question as to the landowner's negligence should the jury be permitted to proceed. In all others, where proof of any essential element falls short, the case should go no further.

*Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 332, 424 N.E.2d 531, 534, 441 N.Y.S.2d 644, 647 (1981) (citations omitted). "In light of the absence of prior criminal incidents or assaults on the premises of the [building] in this case, the district court properly concluded that the history of the premises could not give rise to a duty of care to protect [tenants] from criminal attacks," *Maysonet*, 906 F.2d at 931 (citations omitted), by implementing greater se-

**40**

curity measures.[5]

CONCLUSION

The order of the district court granting summary judgment to the defendants and dismissing the complaint is affirmed in all respects.

---

**5.** Because of our conclusion that defendants were not negligent, we need not address defendants' argument that no derivative action can be brought on behalf of a surviving spouse for loss of consortium, maintenance, contribution, care, society, services and companionship due to the wrongful death of his spouse.